Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2
                       -  -  -

3
ANDREL MARTINEZ,          :    CIVIL ACTION
4          Plaintiff,     :
                          :
5          vs.            :
                          :
6 THE STATE OF DELAWARE   :
DEPARTMENT OF HOMELAND    :
7 SECURITY/DIVISION OF THE :
STATE POLICE; ALICE       :
8 BAILEY, in her individual:
and official capacities; :
9 and NATHANIEL MCQUEEN,   :
JR., in his individual    :
10 and official capacities, :
              Defendants.  :    NO. 1:16-cv-00564-GMS

11
                       -  -  -

12
              Monday, February 12, 2018

13
                       -  -  -

14
15          Oral Deposition of ███████████
███████████., taken at Offit Kurman, P.A., One
16 Commerce Center, 1201 North Orange Street, Suite 10
East, Wilmington, Delaware, commencing at 9:10 a.m.,
17 before Susan Marie Migatz, a Federally Approved
Registered Merit Reporter, Certified Realtime
18 Reporter, Certified LiveNote Reporter, and Notary
Public.

19
                       -  -  -

20
21
22          VERITEXT LEGAL SOLUTIONS
         Registered Professional Reporters
23          300 Delaware Avenue, Suite 815
              Wilmington, DE 19801
24               (302)571-0510

Page 54

1          A.        In this particular case, yeah, I

2    would say yes.

3          Q.        Okay.

4          A.        I don't know about every case.

5          Q.        Right.  Do you know why Andrel wasn't

6    given a hearing in this case, or did he get a

7    hearing, to your knowledge?

8               MR. McTAGGART:  Object to form.

9               THE WITNESS:  Well, there was never a

10              hearing before me, so I can only speculate

11              that he never requested one.

12   BY MR. DELCOLLO:

13         Q.        Okay.  So you know he didn't get a

14   hearing with you.

15         A.        Yes.

16         Q.        And you think perhaps that might be

17   that he didn't request one.

18         A.        Yes.

19         Q.        This is just another question that

20   occurred to me as I was reading this.  There is a

21   sentence here before the last one:  "Subsequent

22   written correspondence from the Human Resources

23   Office will provide you with your options regarding

24   your pension contributions."  What does that mean?

Page 55

1      A.      They would explain to him what his

2  options are as relates to his pension.  So depending

3  on his number of years of service, they would tell

4  him whether he can either withdraw his pension now

5  or at what time he could withdraw from his pension.

6      Q.      Okay.  You said that, to your

7  understanding, a request was not made and that's why

8  a hearing didn't happen.

9      A.      Yes.

10      Q.      So I'm going to ask:  If a request

11  had been made to the Director of Human Resources in

12  writing -- and is that a position within the

13  Delaware State Police?  Is there somebody who is the

14  Director of Human Resources for just the State

15  Police?

16      A.      Yes.

17      Q.      Okay.  Do you know who that

18  individual was at this time?

19      A.      It might have been Captain

20  ████████.  I'm not 100% sure about that.

21      Q.      Captain who?

22      A.      Captain ████████ or ████████.

23  Those are the last two human resources directors.

24  So there may be some overlap there somewhere.

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
   ANDREL MARTINEZ,              )
4                                )
              Plaintiff,         )
5                                )   Civil Action No.
   v.                            )   1:16-cv-00564-GMS
6                                )
   THE STATE OF                  )
7  DELAWARE DEPARTMENT           )
   OF HOMELAND                   )
8  SECURITY/DIVISION OF          )
   THE STATE POLICE,             )
9  ALICE BAILEY, in her          )
   individual and               )
10 official capacities;          )
   and NATHANIEL                 )
11 MCQUEEN, JR., in his          )
   individual and               )
12 official                      )
   capacities,                   )
13           Defendants.         )
14
15
              A deposition of ▮▮▮▮▮▮▮▮, was taken
16 pursuant to notice before John P. Donnelly, Registered
   Professional Reporter, in the law offices of OFFIT
17 KURMAN, 1201 N. Orange Street, Suite 10 East, Wilmington,
   Delaware, on Friday, April 13, 2018, beginning at
18 approximately 9:00 a.m., there being present:
19
20
21              VERITEXT LEGAL SOLUTIONS
                   MID-ATLANTIC REGION
22            300 Delaware Avenue- Suite 815
                 Wilmington, DE 19801
23                  302-571-0510
24
```

Page 22

1    the exact year we had been moved over.

2        Q.    Did you go from Troop 3, to Star Lifter, to

3    headquarters?

4        A.    Our office in homicide was -- homicide was

5    located at Star Lifter, as well.  I went from Troop 3 CI,

6    domestic violence unit over, across the hall into the

7    homicide unit.  I never went back to Troop 3.

8        Q.    Around the 2004 time frame, would that have

9    been you went to Star Lifter?

10       A.    Roughly 2014, might have been --

11       Q.    2014?

12       A.    Somewhere in that time frame.

13       Q.    Before that you were located in the basement

14   of Troop 3?

15       A.    Yes, because then down in the basement of

16   Troop 3 is where the criminal investigation unit was.  At

17   that time when I got taken off the road, transferred off

18   the road from 2005, 2006 roughly, I was transferred to

19   the domestic violence unit, which was an office located

20   in the basement at Troop 3.

21       Q.    How long were you in that role for?

22       A.    Roughly 2005, 2006, until my transfer in 2014,

23   I believe it was, to the homicide unit.  I was also in

24   charge of our youth aid division.  We had a youth aid, as

Page 23

1   well as domestic violence.

2       Q.   So during the course of your service in those

3   various areas, in those roles, did you ever observe

4   officers pulling up people's photographs through the

5   DELJIS system?

6       A.   Yes.

7       Q.   Was that always in the context of a

8   work-related function, to your recollection?

9       A.   Yes.

10      Q.   Did you ever witness officers printing

11  photographs from the DELJIS system?

12      A.   Yes.

13      Q.   Was that always for a work-related purpose?

14      A.   From what I observed, yes.

15      Q.   Did you ever observe an officer running the

16  name of an individual through DELJIS, setting aside, you

17  know, looking at photographs, but running a name, did you

18  ever observe someone running a name outside of a

19  professional context?

20      A.   No.

21      Q.   Did you ever overhear officers discussing the

22  running of a name outside of professional context?

23      A.   No.

24      Q.   Did you ever overhear officers discussing the

Page 24

1    pulling of a photograph from DELJIS outside of a

2    professional context?

3         A.   Never heard them talking about it, no.

4         Q.   Had you ever had any, during the discussion of

5    your time at Troop 3 you sort of also laid out roles that

6    you were in.  Have you ever had any involvement with

7    internal affairs?

8         A.   No.

9         Q.   So you have never been assigned to internal

10   affairs?

11        A.   No.

12        Q.   Have you ever had occasion throughout your

13   years where you have had to work with them for any

14   reason?

15        A.   When we had -- I was assigned to conduct

16   criminal investigations.  If it turned into an internal

17   affairs matter, what my investigation entailed was turned

18   over to internal affairs.

19        Q.   When you say turned into an internal affair

20   matter, how would something turn into an IA matter, how

21   would that be turned over, would that be your decision,

22   would that be internal affairs' decision, how would that

23   process work?

24        A.   I would complete my investigation, notify my

Page 25

1   supervisor, my superior, then they would go ahead and

2   make the notifications.  Nothing where I would call

3   internal affairs and say, I've got this complaint.  We

4   had a chain of command we would have to follow through

5   since I was sergeant, go to the Lieutenant, then go to

6   the Captain.

7       Q.   Correct me if I am wrong, is it fair to say

8   that you were involved in a criminal investigation

9   involving Mr. Martinez?

10      A.   Correct.

11      Q.   In the context of that criminal investigation,

12  you investigated a number of charges, I think, or a

13  number of charges came out of that; is that correct?

14      A.   Yes.

15      Q.   They were charges for misuse of DELJIS, and

16  stalking and harassment; is that accurate?

17      A.   Yes.

18      Q.   Is there any other that you can recall?

19      A.   I only investigated the stalking and the

20  harassment.  Sergeant ███████, at the time, he took --

21  investigated the DELJIS incidents.

22      Q.   Do you recall how it was that you were

23  assigned to investigate those criminal issues, how did

24  that process work?  Did someone call you and say, "do

Page 26

1   this investigation"?

2       A.   Yes, I was notified by my criminal Lieutenant,

3   Lt. ████.

4       Q.   So he assigned the investigation of the

5   criminal aspect of Mr. Martinez's case to you?

6       A.   Yes.

7       Q.   Did you have any discussion with Mr. ████

8   about that assignment?

9       A.   That was a telephone call that I received at

10  home in the evening.  I was told to contact Sergeant

11  Whitmarsh in regards to a domestic that came about

12  through the DELJIS investigation he was conducting.

13      Q.   So let me make sure I understand that.  Is it

14  that during his investigation -- did you actually reach

15  out to Sergeant ████?

16      A.   Yes.

17      Q.   And during the discussion, did he say to you,

18  here is what I found.  Investigate this, like, how did

19  that discussion go?

20      A.   I was told by ████ to contact ████

21  ████ in regards to the domestic, to get the details.

22  I contacted ████, informed me while in the

23  course of conducting the DELJIS violation, there was

24  concern there was a domestic involving Mr. Martinez and

Page 27

1   Sara Loiselle.

2       Q.   As I understand it, you were involved in

3   conducting a search on Mr. Martinez's residence, is that

4   correct?

5       A.   Yes.

6       Q.   You were also the officer that conducted his

7   arrest, correct?

8       A.   Myself and ███████████████

9       Q.   Did that together?

10      A.   Yes.

11      Q.   Was that on the same day?

12      A.   Yes.

13      Q.   Did you ever interact with Mr. Martinez prior

14  to investigating his case and ultimately doing the search

15  and arresting him, did you ever have any interactions

16  with him prior to that?

17              MR. MCTAGGART:  Objection.

18              THE WITNESS:  I don't understand, if I

19  have had interactions with Mr. Martinez prior to all this

20  coming about?

21  BY MR. DELCOLLO:

22      Q.   Correct.

23      A.   Yes.

24      Q.   Did you ever work with him?

Page 45

1      (A short recess was taken.)

2      MR. DELCOLLO:  I do have a few things.

3      MR. MCTAGGART:  I thought we were done.

4      MR. DELCOLLO:  Off the record.

5      (Discussion held off the record.)

6      EXAMINATION

7  BY MR. DELCOLLO:

8      Q.   I just want to explore briefly because I

9  recall you said is there was a basement to Troop 3?

10     A.   Yes.

11     Q.   Could you prepare a sketch of that for me,

12  also, similar to what you did before, label the rooms and

13  so forth for basement.  Were there any other rooms

14  besides the basement and the main floor?

15     A.   No.

16     Q.   Could you describe for me your sketch for the

17  record and rooms that you have labeled here?

18     A.   This is the old Troop 3, definitely not to

19  scale, trying to do it best I can recall.  When I first

20  came to Troop 3, I was first assigned in 1988.  At the

21  time this used to be the old FAIR team office.  This is

22  where I was assigned to.  I was transferred in 1992.  You

23  would come down from the basement stairs, there was a

24  storage area right at the base of the steps.  You come

Page 44

1   investigation?

2       A.   No.

3       Q.   Did you ever attend any meeting where that

4   topic was ever discussed?

5       A.   No.

6       Q.   Did you ever attend any meeting with Sergeant

7   ▮▮▮▮▮▮ with that topic was every discussed no?

8           MR. MCTAGGART:   I have nothing further.

9           EXAMINATION

10  BY MR. DELCOLLO:

11      Q.   Is it true that the charges of harassment and

12  stalking, Mr. Martinez was never convicted of stalking or

13  harassment?

14      A.   There was a plea.   It never went to trial.

15      Q.   He was never convicted or pled guilty to

16  harassment or stalking?

17      A.   Correct.

18          MR. DELCOLLO:   Nothing further.

19          EXAMINATION

20  BY MR. MCTAGGART:

21      Q.   Was he indicted on those charges?

22      A.   Yes.

23          MR. MCTAGGART:   That's all I have.   We

24  will read and sign.

Page 46

1   down the hallway -- when I was first assigned in May or

2   September of 1988, this used to be an open basement area,

3   no walls except for should have been a hallway here where

4   the communication room is.  That is where we have all of

5   our lines for telephones for Troop 3.

6           This used to be our sketch artist room,

7   then the polygrapher was always there.  As time changed,

8   our evidence unit was also located down in the basement.

9   I was assigned back then, this was an office area.   Then

10  back in this area here was the men's bathroom, shower and

11  locker room area.  Entrance going in.  As time changed,

12  criminal investigation unit moved downstairs, still come

13  down the stairs, go down the hallway.  The sketch

14  artist's room was turned into the domestic violence

15  office.  Polygrapher stayed where they were, closet back

16  in the hallway.  Come down the hallway, to your right was

17  the evidence room, and across there was a wall that

18  placed in here.  That is where the criminal

19  investigations unit, that is where all the detectives

20  were assigned.

21          Sergeant's area was -- there is a wall

22  with a doorway to go in the sergeant's area for the

23  criminal investigation unit.  This office was turned into

24  the criminal Lieutenant's office.  This still remained as

Page 47

1   the evidence room.

2          This is the entrance coming from the back

3   of the building down to the basement.  This was a hallway

4   that went through here.  A boiler room located off to

5   your left, but this whole back area was evidence.

6       Q.   Could you do me a favor and label for me

7   similar to the other diagram, the time frames that you

8   spent in various areas if you can recall?

9       A.   Evidence was 1994 through 2004.  FAIR team was

10   1992 through 1994.  Domestic violence roughly there was a

11   time frame -- I apologize, there was a time frame where I

12   was our court liaison officer, I believe that was from --

13   2004 to roughly 2006, then I was assigned to patrol for

14   one year, then moved to our domestic violence unit.

15   Within that time frame, would have to be somewhere in the

16   area of maybe 2008, 2009, I don't recall.  Then we then

17   moved from Troop 3, old Troop 3 over to the Star Lifter

18   building, that was around 2014, 2015.  I don't recall the

19   exact dates.

20       Q.   So were you ever in criminal investigations

21   during the time frame that it was in the basement area?

22       A.   I was in there when I was in evidence,

23   criminal investigation area was located over in this

24   area.  I was in evidence, then when I was transferred to

Page 48

1   domestic violence, I was over in this area. Criminal

2   investigations was located over here.

3        Q.   You mentioned a time frame that you served as

4   court liaison officer. What did that entail?

5        A.   I was responsible for subpoenas, going to

6   court, calling officers in, report if they were needed,

7   keeping track of subpoenas.

8        Q.   So during that time frame when you say

9   subpoenas, keeping track of subpoenas and calling

10  officers into court, would you have a list of officers

11  that were subpoenaed, then reach out to them, make sure

12  they showed up, was that your function?

13       A.   Officers were placed on standby, which means

14  they did not have to come into -- I was responsible for

15  Court of Common Pleas, also for Superior Court. The

16  officer did not have to come in to Superior Court or

17  Court of Common Pleas, they were what we call standby.

18  If I contacted them, they were needed for trial, I would

19  contact them on the phone, they would have a half hour to

20  get to court for the trial.

21       Q.   So was that your primary function while you

22  were liaison, were there other things that you had to do

23  during the course of time?

24       A.   I was assigned to NCIC validation for the

Page 49

1    troop during that time frame.   Then once I got

2    transferred to the domestic violence unit, there was a

3    transition period where we did not have a court liaison

4    officer.   In the morning I would do the court liaison,

5    afternoon I would come back and do domestic violence.

6         Q.    What is NCIC validation?

7         A.    Anybody that -- any item that is entered into

8    NCIC, whether an article, someone reported they had a

9    firearm stolen, had their gun stolen, and it is entered

10   into NCIC, our State Police communications sends us a

11   list of all items listed into NCIC, as far as whether it

12   was stolen, missing person.   We would have to conduct

13   inquiries to make sure these items were still missing.

14   If the individuals had returned, we can clear them out of

15   NCIC.   If the owner of the gun or property wanted that

16   item to remain in NCIC, it remained.

17        Q.    What does NCIC stand for?

18        A.    National Criminal Information Center.

19        Q.    National Crime Information Center?

20        A.    Yes.

21        Q.    Is that like a database of some sort?

22        A.    Yes.

23        Q.    That is national?

24        A.    Yes.

Page 50

1      Q.   What function does that database serve?

2      A.   If an article, especially a weapon was located

3  in Maryland or Pennsylvania, if Maryland or Pennsylvania

4  ran that serial number of that weapon, it would come back

5  it is stolen out of Delaware.  They would hold it.  If a

6  person is a missing person, they are located in another

7  state, when they run that individual's name, it comes

8  back and says they are missing from the State of

9  Delaware.

10     Q.   So did you do that at the same time that you

11 were acting as liaison?

12     A.   Yes.

13     Q.   Is it typical that you are assigned both of

14 those functions whenever a person is liaison, or do they

15 not always get assigned together?

16     A.   It is possible they don't get assigned

17 together.

18          MR. DELCOLLO:  I have nothing further --

19 BY MR. DELCOLLO:

20     Q.   During your tenure down here, just so the

21 record is clear, ask you some broader questions about

22 DELJIS access.  Printing off photographs while you were

23 down in this area, did you ever witness someone printing

24 off a photographs from DELJIS outside of their work

Page 51

1   responsibilities?

2         A.   I never witnessed anybody printing anything

3   off from DELJIS.

4         Q.   So you never saw any DELJIS information posted

5   on a wall, or hung up anywhere down in the basement area?

6         A.   What do you mean by "DELJIS information"?

7         Q.   So, like, a photograph from DELJIS, did you

8   ever see anything like a printed off?

9         A.   I have seen photographs.  I don't know where

10  they come from, the origin of that.

11        Q.   So you have seen photographs, like, hung in

12  this basement area; is that accurate?

13        A.   Yes.

14        Q.   You wouldn't know the origin of them?

15        A.   Correct.

16        Q.   So when you say, "I wouldn't know the origin

17  of them," what -- were they printouts, like, from a

18  computer that you saw, or were they physical photographs

19  from --

20        A.   They were printouts.

21        Q.   So is there anyway to determine when an item

22  is produced from DELJIS it came off from DELJIS --

23        A.   Yes.

24        Q.   -- or is there no indication?

Page 52

1    A.    Yes, if an individual is run through DELJIS,

2  it is tracked through DELJIS.

3    Q.    So how would you determine if you had a piece

4  of data that was part of a DELJIS record, like a

5  printout, a page, how would you be able to tell it is

6  from DELJIS?

7    A.    You can contact DELJIS to have them conduct an

8  inquiry of that.  If your name, or whatever was ran

9  through DELJIS, they can go back an track who ran that.

10    Q.    If we are looking at a piece of paper printout

11  that was printed off of the DELJIS system, is there any

12  way by looking at the document itself that you can tell

13  it came from DELJIS?

14    A.    Background, coloring of the background.

15    Q.    What is that?

16    A.    It's blue color, light blue.

17    Q.    So anything coming from DELJIS has a light

18  blue background color?

19    A.    To my best of my knowledge, yes.

20    Q.    You never saw any photographs or printouts

21  posted in the basement area of Troop 3 that looked to you

22  like it would have come from DELJIS because of the

23  coloring?

24    A.    Sorry, have to --

Page 53

1   Q.   You never saw any printouts that looked like

2   they came from DELJIS posted in the area of Troop 3 and

3   the reason that you don't think they came there is they

4   didn't have that coloring, you didn't see anything like

5   that?

6   A.   I think I said that I did see photographs of

7   up there.   I did see pictures.   The origin, I am not

8   sure.

9   Q.   Did you ever see any -- where did you see

10  pictures, photographs posted?

11  A.   They have a cork board.   I can't recall the

12  location of it exactly.

13  Q.   So you would see pictures up there, did you

14  ever see a pictures posted on this cork board -- let

15  me -- was it in the basement area, or in the upstairs

16  area?

17  A.   We had cork boards in the basement area, as

18  far as what was posted, I never walked up to see, or

19  looked at it.   I was never -- I did not have much

20  interaction in this area of the troop.   My interaction

21  was over here in domestic violence or the evidence unit

22  was most of the time an individual come over to our area

23  for inquiries.   I was away in the morning, come back in

24  the afternoon, and work in my office over here or

Page 54

1   evidence.

2        Q.   So you recall there being a cork board in the

3   basement area, but you don't recall what was precisely on

4   the cork board?

5        A.   Correct.

6        Q.   Do you recall seeing photographs on the cork

7   board from time to time?

8        A.   There were photograph also, as far as like I

9   said, again, the origin or what they were about, I don't

10  recall.

11       Q.   So just to be very precise, you never saw a

12  photograph or printout that had that coloring on it?

13       A.   I can't recall.

14       Q.   So you wouldn't be able to affirmatively say

15  that there was never one there?

16       A.   No.

17       Q.   Because you can't recall?

18            MR. MCTAGGART:  Object to form.

19            MR. DELCOLLO:  I have nothing else.

20            MR. MCTAGGART:  We will read and sign.

21            MR. DELCOLLO:  Mark this as four.

22            (Deposition Exhibit number four was

23  marked).

24                         -- -- --

Page 2

1       A telephone deposition of ███████████

2   was taken before Shavon Kolb, Registered

3   Professional Reporter and Notary Public, in the

4   law office of Offit Kurman, P.A., 1201 North

5   Orange Street, Suite 10 East, Wilmington,

6   Delaware, on Friday, June 15, 2018, beginning at

7   approximately 3:00 p.m., there being present:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 42

1   you as the DELJIS security manager receive signed

2   Attachment A forms after this policy was issued?

3       A.      We do.  Yes.

4       Q.      So you're receiving them still to this

5   day?

6       A.      We have indirect users and new users.

7       Q.      Okay.  Did you receive signed Attachment

8   As from the Delaware State Police?

9       A.      For new users and indirect users.

10      Q.      Did you receive signed Attachment As

11  after the issue date for this policy for people

12  who were already users?

13      A.      I can't answer that for sure because

14  some do it anyway and some do it -- they do it

15  both ways.

16      Q.      What do you mean by they do it both

17  ways?

18      A.      Some will send a hard copy, and some

19  will do it electronically.

20      Q.      Is there any part of the policy that you

21  can point to that makes an electronic acceptance

22  or the -- let me rephrase that.  Is there any part

23  of the policy that you can point to that says an

24  electronic acceptance can be done in place of a

Page 43

1   signing and returning of Attachment A?

2       A.    No.   I don't believe so.

3       Q.    Moving back to page no. 2, there's an

4   Exhibit No. 3 which you say, "Attached as Exhibit

5   No. 3 is a copy of the DELJIS electronic page,

6   which shows Mr. Martinez' electronic signature on

7   April 24, 2013, in which he checked A as

8   acknowledging that he read and agreed to comply

9   with DELJIS Directive No. 4."   What exactly is it

10  on Exhibit No. 3 that is an electronic signature?

11  Which part of that is an electronic signature?

12      A.    Where it says policy for a signed date.

13      Q.    Policy for a signed date.   Okay.   I see

14  it says policy for a signed date 4/24/13.   Which

15  part of that is the electronic signature?

16      A.    That's it.   The date.

17      Q.    So it's your position that the date is

18  an electronic signature?

19      A.    Yes.

20      Q.    What do you mean when you use the word

21  "signature" typically?   What does that word mean

22  to you?

23           MR. MCTAGGART:   Object to form.   At this

24  point we're almost near the hour.   We agreed to do

Page 44

1   an hour deposition.  Do you have a couple more

2   questions?  We're almost near the hour.

3          MR. DELCOLLO:  I do.  And we did spend a

4   little bit of time, perhaps three minutes in the

5   beginning.  I'm almost done.  I'm seeing that I

6   have about three minutes left on my phone.  So I

7   do have a couple more questions.

8   BY MR. DELCOLLO:

9       Q.   Just to make sure we understand what you

10  mean, the 4/24/13, that actual date is the

11  electronic signature itself?

12         MR. MCTAGGART:  I'm going to object.

13  That's been asked and answered.

14         MR. DELCOLLO:  Okay.  Are you

15  instructing the witness not to answer?

16         MR. MCTAGGART:  No, I'm not instructing

17  her not to answer, but you've asked her already.

18         MR. DELCOLLO:  I just want to make sure

19  I understand what she means.  I'm a little bit

20  confused by what she means at this point.

21  BY MR. DELCOLLO:

22      Q.   ████████, I want to understand, the

23  actual date itself, when you refer to electronic

24  signature in your Declaration, the date itself is

Page 45

1   what you mean by electronic signature?

2       A.    That's electronic signature, the day it

3   was electronically signed.   Yes.

4       Q.    So my question final then, if you go

5   down to your -- final couple of questions.   If you

6   go down to Declaration page 2, it says, "I have

7   reviewed the DELJIS records and determined that

8   Mr. Martinez attended a DELJIS security briefing

9   and training session on May 17, 2011," period.

10  "DELJIS maintains copies of the sign-in sheets

11  from those sessions," period.   "A copy of this

12  sign-in sheet is attached as Exhibit No. 4,"

13  period.   "I'm also attaching a copy of former

14  DELJIS director ███████████ PowerPoint slides as

15  Exhibit No. 5."   Were those PowerPoint slides used

16  at this May 17 training?

17      A.    Yes.

18      Q.    Were you there at the May 17 training?

19      A.    No, I wasn't.

20      Q.    Okay.   How do you know they were used?

21      A.    That was their standard, PowerPoint

22  slides.

23      Q.    So was ███████████ at that briefing?

24      A.    She might have been.   I can't answer

Page 46

1  that for 2011.

2       Q.    When you say that they were the standard

3  slides, what do you mean?

4       A.    Our trainers use standard slides for

5  training.

6       Q.    So these slides are the standard slides

7  for training that were in effect as of May 17,

8  2011?

9       A.    I can't really answer that.  I'm not the

10 trainer.

11      Q.    Okay.  So you're referencing this

12 security briefing and training session.  Had you

13 ever attended a security briefing and training

14 session?

15      A.    Have I?

16      Q.    Yes.

17      A.    I have.

18      Q.    And do you know if they're the same

19 every time?

20      A.    They are the same.  It's what we use for

21 training, unless there's updates over the years,

22 but during that time, that's what we were using.

23      Q.    So this May 17, 2011, training session,

24 you believe Exhibit No. 5 was used at that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF DELAWARE
2
                        - - -
3
ANDREL MARTINEZ,            :   CIVIL ACTION
4            Plaintiff,      :
                            :
5            vs.             :
                            :
6   THE STATE OF DELAWARE    :
    DEPARTMENT OF HOMELAND   :
7   SECURITY/DIVISION OF THE :
    STATE POLICE; ALICE      :
8   BAILEY, in her individual:
    and official capacities; :
9   and NATHANIEL MCQUEEN,   :
    JR., in his individual   :
10  and official capacities, :
             Defendants.     :   NO. 1:16-cv-00564-GMS
11
                        - - -
12
           Monday, April 30, 2018
13
                        - - -
14
     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
15
                        - - -
16
         Oral Deposition of ██████████
17  ████████ taken at Offit Kurman, P.A., One Commerce
    Center, 1201 North Orange Street, Suite 10 East,
18  Wilmington, Delaware, commencing at 9:45 a.m.,
    before Susan Marie Migatz, a Federally Approved
19  Registered Merit Reporter, Certified Realtime
    Reporter, Certified LiveNote Reporter, and Notary
20  Public.
21                      - - -
22         VERITEXT LEGAL SOLUTIONS
         Registered Professional Reporters
23         300 Delaware Avenue, Suite 815
             Wilmington, DE 19801
24             (302) 571-0510

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 17

1      "Hey, can you translate for me?  I have a

2      Spanish-speaking person."  Other times

3      sometimes people would say, "I have some of

4      your people here.  Can you translate?"

5  BY MR. DELCOLLO:

6      Q.    When you say "some of your people,"

7  what do you mean?  What did they mean, to your

8  understanding?

9      A.    It would be somebody that was

10 Spanish-speaking.

11     Q.    Okay.  Did they ever say anything to

12 the effect of "Could you come habla with your

13 amigos"?  Do you recall anyone asking that way?

14     A.    Yes.

15     Q.    Do you remember anyone saying things

16 to the effect of "Hey, could you come habla with

17 some of your wetback buddies?  I don't know what

18 they want"?  Did you ever hear anyone ask him to

19 translate in such a manner?

20     A.    I mean, it sounds familiar, yes.

21     Q.    So it sounds like to you ways that he

22 would have been asked to translate.

23     A.    Yes.

24     Q.    Okay.  Do you recall any specific

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 18

1   names of officers or people who asked him to

2   translate?

3           A.      It was years ago.  I suppose the

4   specific people, I couldn't give you a name.

5           Q.      Okay.

6           A.      I just remember the conversations.

7           Q.      Do you recall any occasion during

8   Mr. Martinez' tenure where he was referred to as

9   "the Latin lover" by his colleagues on staff?

10          A.      Yes.

11          Q.      And how often did that happen?

12          A.      I couldn't give you an exact number.

13  I mean, I've heard the term before.

14          Q.      In reference to Mr. Martinez.

15          A.      Yes.

16          Q.      Do you ever recall an occasion where

17  he was referred to as "the Peruvian General" before?

18          A.      Yes.

19          Q.      And that was, again, during your time

20  at Troop 3.

21          A.      Yes.

22          Q.      And that was in reference to

23  Mr. Martinez.

24          A.      Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 19

1    Q.    Did you ever see any occasions where
2    any sort of photos were printed out of Mr. Martinez,
3    maybe with like a mustache on his face or something
4    like that, or like superimposed with medals on the
5    chest?  Do you recall anything like that occurring
6    during your time there?
7        A.    I mean, there have been pictures
8    printed out.  But I don't remember the exact like
9    manner in which the face was put onto another
10   picture.
11       Q.    So when you say pictures printed out
12   and not the exact manner, could you explain what you
13   mean by that?  What do you remember as far as
14   pictures being printed out?
15       A.    So sometimes people will print
16   pictures out of somebody's face and they'll put them
17   onto another picture of a body.  But as to the exact
18   body that the picture was put on, I don't --
19       Q.    You can't recall?
20       A.    I can't recall.
21       Q.    But you remember things like that
22   occurring?
23       A.    Yeah.  They would be hung up around
24   the troop.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 20

1   Q.    Do you remember anything like that

2   occurring with Mr. Martinez?

3   A.    Pictures?

4   Q.    Yes.

5   A.    Yes.

6   Q.    Where he was the subject of such a

7   picture.

8   A.    Yes.

9   Q.    Do you remember if any of those

10  pictures alluded to his Hispanic ancestry?

11  A.    Like I said, I don't remember the

12  exact body that was on it; but, I mean, sometimes

13  people would joke around or whatever and put

14  pictures on.  But I guess the exact body that the

15  head is on I can't remember the exact detail of.

16  Q.    Okay.  So you're describing, just to

17  make sure the record is clear, an occasion where

18  somebody would take a picture of --

19  A.    A head.

20  Q.    -- a head, presumably of a trooper --

21  A.    Yes.

22  Q.    -- and put that picture of their

23  head, the portrait of their head, on top of another

24  person's body.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 21

1   A.   Yes.

2   Q.   Okay.

3   A.   Or like something from Google or some

4   picture taken from the Internet.

5   Q.   All right.  You mentioned something

6   from Google.  Do you remember where the pictures of

7   the troopers were coming from, by chance?  How did

8   they get pictures of troopers with their photos?

9   A.   DELJIS.

10   Q.   So people would access DELJIS to pull

11   photographs off for this purpose.

12   A.   Yes.

13   Q.   Is that, to your understanding, a

14   professional use of DELJIS?  Was there any type of

15   criminal investigation or official purpose for that

16   behavior?

17   MR. McTAGGART:  Object to form.

18   MR. DELCOLLO:  Let me rephrase the

19   question.

20   BY MR. DELCOLLO:

21   Q.   Do you know if that behavior with the

22   pictures being superimposed was done because of a

23   criminal investigatory purpose?

24   A.   I mean, I don't know.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

1    Q.    So was there any official purpose for

2  taking those pictures off of DELJIS and doing the

3  superimposing that you are discussing?

4        A.    Like as a criminal investigation?

5        Q.    Yes.

6        A.    So just to make sure I have the

7  question right, like I guess is there a criminal

8  investigation need for the picture?

9        Q.    Yes, that you are talking about.

10        A.    Or they're just doing it because

11  they're doing it to be funny?

12        Q.    That's the question that I'm asking,

13  yes.

14        A.    So they would just be doing it to be

15  doing it because they're trying to be funny.

16        Q.    Right.  And so in order to pull such

17  a photograph off, you have to actually go into the

18  DELJIS system and access the DELJIS system.

19        A.    Yes.

20        Q.    Okay.  So when you say that these

21  behaviors were observed by you, do you know where

22  the photographs were and where they were able to be

23  observed?  Where were they around the troop?

24        A.    There's different areas.  I mean,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 23

1   some of them would be by the mailboxes.  I've seen

2   them in the patrol rooms, other areas where officers

3   would conjugate around the troop.  I mean, they just

4   kind of put them up.

5         Q.     Around the troop.

6         A.     Right.

7         Q.     Do you know if any of the troop

8   commanders or the folks further up the chain saw

9   these photographs?

10        A.     I couldn't speak for them.  I don't

11  know.

12        Q.     Were they put in any way that would

13  prevent anyone who was a police officer walking

14  through the troop from seeing them?

15             MR. McTAGGART:  Object to form.

16  BY MR. DELCOLLO:

17        Q.     So they were just readily observable

18  by anyone who was walking through the troop; is that

19  fair to say?

20        A.     I mean, some of them; yes.  I mean,

21  this is at the old troop.  We're at the new troop

22  now.  So at the old troop you had the mailboxes and

23  people would put stuff on the mailboxes.  So, I

24  mean, anybody checking their mail could see it.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 24

1    Q.    Were all the mailboxes in the same

2    place?

3    A.    Well, there was like a whole wall,

4    like almost as big as this wall, full of mailboxes.

5    So the majority of the mailboxes are there.  I mean,

6    there are special units.  I think their mailboxes

7    were other places.

8    Q.    Elsewhere.

9    A.    Some of them were there.  Some of

10   them, it depends.  I mean, at one point there was

11   more people than mailboxes so...

12   Q.    Do you know if the mailboxes were

13   just for corporals and troopers or were there also

14   sergeants, lieutenants, and captains that had their

15   mailboxes in the same place?

16   A.    That I'm not 100%.  I don't remember

17   100% sure.

18   Q.    Okay.  Regarding the issue of

19   mailboxes then, did you ever see anyone placing any

20   items into Mr. Martinez' mailbox aside from mail?

21   A.    Physically see somebody put something

22   in there?

23   Q.    Yes.

24   A.    No.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 25

1    Q.    Did you ever observe Mr. Martinez

2  taking anything out of his mailbox aside from mail?

3    A.    Like?

4    Q.    Well, as an example, there's a

5  remembrance in some of the depositions, one

6  deposition in particular, of coupons from Taco Bell

7  being placed into Mr. Martinez' mailbox.

8              Is that type of thing anything that

9  you recall seeing or observing, Mr. Martinez take

10  Taco Bell coupons out of his mailbox?

11    A.    It was so long ago, to actually say I

12  saw him take them out, I don't remember.  But I do

13  remember him having coupons and saying somebody put

14  them in his mailbox.

15    Q.    So you recall him saying to you that

16  "I've got these coupons, someone put these in my

17  mailbox"?  Is that what you recall?

18    A.    Yes.

19    Q.    Okay.  That was at the time that you

20  were both serving in Troop 3?

21    A.    Yes.

22    Q.    Was that one occasion or were there

23  multiple occasions where he would mention that?

24    A.    That I don't remember.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1    Q.    But you remember at least one

2  occasion there.

3        A.    At least one occasion.

4        Q.    You have to use DELJIS in the context

5  of your duties as a police officer; correct?

6        A.    Yes.

7        Q.    If you received training, what sort

8  of training did you receive regarding how to use

9  DELJIS and when?

10       A.    So the training was when you're at

11  the Delaware State Police Academy, as you were going

12  through what you needed for your certificate of

13  police training, at one point they took us from the

14  Academy and took us over by Silver Lake to the

15  DELJIS building and that's where we were trained on

16  DELJIS.  I don't remember the exact length of the

17  training, but at some point we spent time at the

18  DELJIS computer lab over there.

19       Q.    And do you remember how you were

20  taught regarding the appropriate uses for DELJIS?

21       A.    It was a long time ago.  The exact

22  training of how it was?

23       Q.    Yes.  And, in particular, I

24  understand what DELJIS is and how to access it.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 27

1   What I'm specifically asking you is how they taught

2   you, if they taught you; and, if so, what is

3   considered a correct use of the system --

4          A.      Right.

5          Q.      -- as opposed to one that would

6   violate policy.

7          A.      Right.  Well, it's a little different

8   now than it was back then.

9          Q.      Right.  If you can recall how it was

10  back then, please let me know.

11         A.      Well, there was one thing in

12  particular that the training is completely different

13  now, and I remember they didn't have the database

14  like they do now, where like they have fake names in

15  there now, they have training names in there.

16         Q.      Right.

17         A.      But back in the day they didn't have

18  that, so they had you run people you knew, but they

19  were like "You can't disseminate the information."

20         Q.      So when you say "run people you

21  knew," anyone that you knew; is that what you mean?

22         A.      Basically specifically they said

23  you're going to know -- you know more about people

24  than -- I'm trying to think of the exact.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 28

1       They wanted a way for you to run

2  people so you can see information, so they would

3  have you run like your mom, your dad, family,

4  friends, whatever, that you would know about.

5       So you could run it different ways,

6  so run date of birth or run first name/last name or

7  then run last name/date of birth/initial, things

8  like that, to give you different ways to find a

9  person because you would know who you're looking

10 for.  And then you would see the information and all

11 that stuff from there.  But they were like "You

12 can't disseminate it.  It's for training purposes

13 only."

14      Q.      So --

15      A.      And --

16      Q.      Continue.

17      A.      And at some point that process

18 stopped and obviously you can't do it now.  I can't

19 tell you the exact time of when that process

20 stopped.

21      And I knew that that process had

22 stopped years back when people started getting in

23 trouble for running other people.  Specifically,

24 there was like a Wyoming op or something like that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 29

1  that when I first got to Troop 3, I was like, huh,

2  that's kind of weird.  And then because of the

3  refresher training on how to do all that stuff and

4  information, it kind of became like through word of

5  mouth and through knowledge of other people that,

6  hey, you can't do that anymore.

7           And then at some point DELJIS started

8  putting training names in there.  So then they were

9  like, okay, run this name or that name.

10         Q.    As opposed to just running --

11         A.    Right, people.

12         Q.    -- random names of actual people.

13         A.    Yeah.  I mean, you're talking about

14  16, 17 years ago when the training was versus today,

15  you know.  So that part was completely different,

16  you know.  You know what I mean?  It's changed.

17  It's evolved with time.

18         Q.    We had an officer testify earlier

19  today that said that the golden rule was you could

20  run anyone, but don't disseminate.  Is that a fair

21  characterization of how you were taught originally

22  to use the system?

23         A.    Back in the day --

24         Q.    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1      A.      -- yes.

2      Q.      What was the answer?

3      A.      Back in the day, yes.

4      Q.      So you were taught that you could run

5  folks that you weren't investigating for any crime;

6  is that fair to say?

7      A.      Back in the day.

8      Q.      Back in the day.

9      A.      Yes.  I mean, there's been a

10  crackdown now.

11      Q.      And I'm going to ask you some

12  questions about that.  But right now I'm interested

13  in how you were originally taught.

14      A.      Right.

15      Q.      Then I'll have some questions about

16  when that shift occurred.

17              So; again, back in the day, when

18  they're saying run anyone, don't disseminate, you

19  would run names that weren't being run in connection

20  with any criminal investigation; is that fair to

21  say?

22      A.      Yes.

23      Q.      And so names were also run pursuant

24  to that training that you didn't suspect.  Like

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2                      - - -

3
    ANDREL MARTINEZ,          :   CIVIL ACTION
4            Plaintiff,       :
                              :
5            vs.              :
                              :
6   THE STATE OF DELAWARE     :
    DEPARTMENT OF HOMELAND    :
7   SECURITY/DIVISION OF THE  :
    STATE POLICE; ALICE       :
8   BAILEY, in her individual :
    and official capacities;  :
9   and NATHANIEL MCQUEEN,    :
    JR., in his individual    :
10  and official capacities,  :
            Defendants.       :   NO. 1:16-cv-00564-GMS

11                     - - -

12           Monday, April 30, 2018

13                     - - -

14    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15                     - - -

16        Oral Deposition of ████████████████
17  taken at Offit Kurman, P.A., One Commerce Center,
    1201 North Orange Street, Suite 10 East, Wilmington,
18  Delaware, commencing at 8:42 a.m., before Susan
    Marie Migatz, a Federally Approved Registered Merit
19  Reporter, Certified Realtime Reporter, Certified
    LiveNote Reporter, and Notary Public.

20                     - - -

21
22           VERITEXT LEGAL SOLUTIONS
             Registered Professional Reporters
23           300 Delaware Avenue, Suite 815
                 Wilmington, DE 19801
24                 (302)571-0510

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 9

1    something like that?

2           A.      Or a good example would be like an

3    Alzheimer's patient or a child.

4           Q.      Okay.  Right.  So you may have to try

5    to find an Alzheimer's patient or a lost child.

6           A.      Yes, yes.

7           Q.      For those functions that you're

8    performing in that capacity, how often do you have

9    to access DELJIS?

10          A.      Well, I've had to access DELJIS more

11   related to the medical missions than as opposed to

12   the criminal missions, the search missions.

13          Q.      What do you do when you are using

14   DELJIS in the context of the medical side?

15          A.      I guess it's infrequently, but I can

16   think of an example just recently where -- actually,

17   I can think of two examples just recently, wherein,

18   in fact, the last patient I transported was a

19   3-year-old boy.  Long story short, he was run over.

20   I spoke with the father at the hospital.  I realized

21   they had an active case with DFS.

22          Q.      Right.

23          A.      He had five siblings.  There were

24   some discrepancies with the dates of birth and I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 10

1   wanted to make sure I was dealing with the right

2   child.  So for that purpose I accessed DELJIS and

3   his mother had just been -- I don't know if she was

4   arrested, I didn't look that deeply, but she was

5   taken into custody for a heroin overdose so there

6   was a recent file with current dates of birth for

7   all the children.  So I just was able to determine

8   that I had the right child.

9                Previous to that I transported a

10  young lady that she was found unresponsive in the

11  middle of the white clay creek state park and I was

12  able -- it was investigated by DNREC and I was able

13  to use DELJIS to positively identify her so they

14  could obtain her medical history.

15       Q.     Okay.  When you say infrequently in

16  reference to DELJIS in the medic portion of what

17  you're doing, how frequently would you say you use

18  DELJIS?

19       A.     I'd say on average maybe once every

20  two months.

21       Q.     And regarding the other components of

22  your responsibilities, you said you would use it,

23  and if I'm wrong, please correct me me, but I think

24  you said you use DELJIS more in the medic side than

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 11

1    in the other three or so components.

2              A.      Yes, that's a fair statement.

3              Q.      And how often do you use DELJIS for

4    the other 50% then?

5              A.      I don't know if it's 50%.

6              Q.      Or the other whatever percent it was.

7              A.      The majority, yeah.

8              Q.      Yes.

9              A.      Again, the only example I can think

10   of is if we know the subject that we're looking for,

11   I might bring them up to see what I'm dealing with

12   as far as how dangerous he is or what he may look

13   like, more importantly.

14             Q.      Right.  Generally speaking, when

15   you're doing a search mission, I guess, that would

16   be the context, you're talking about that, if we

17   need to know the subject we're looking for.  Is that

18   fair to say?

19             A.      That's fair, I think, yes.

20             Q.      How frequently within that function

21   do you actually know or do you have enough

22   information -- I guess let me ask this in a

23   different way.

24                     How often or how many times that you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 12

1   can recall have you had to use DELJIS regarding that

2   function of your job?

3        A.    Very infrequently.  Like I'd say

4   probably ten the entire time I've been a medic.

5        Q.    And how long have you been in this

6   function in your career?

7        A.    Since 2012.

8        Q.    Okay.  What were you before 2012?

9        A.    I was assigned to uniform patrol.

10       Q.    And how long were you in that

11  function?

12       A.    13 years.

13       Q.    And so maybe I'm not doing my math

14  exactly, but I'll ask the next question:  Were you

15  in any other role prior to that?

16       A.    No.

17       Q.    So your two primary roles were

18  uniformed officer doing patrol?

19       A.    Yes.

20       Q.    And then as a medic?

21       A.    Yes.

22       Q.    Okay.  Did you have to go to school

23  to become a medic?  I mean, I guess you switched

24  what you were doing in the middle?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 13

```
 1        A.      Yes.
 2        Q.      How did that come about?
 3        A.      I requested a transfer and my
 4   transfer request was honored, and then they sent you
 5   to school full time to be a paramedic.
 6        Q.      So when you say "they," the State
 7   Police --
 8        A.      The State Police, yes.
 9        Q.      -- would send you.
10        A.      Yes.
11        Q.      Okay.  Is there a special school that
12   you guys go to just for the State Police or do you
13   go to one that everyone else is being trained at?
14        A.      We go to Del Tech and we're in class
15   as civilians.
16        Q.      During the time frame that you're
17   learning to be a medic, are you doing that full
18   time?
19        A.      Yes.
20        Q.      So you're full time let's be a medic
21   and then go back to your police responsibilities?
22        A.      Yes, full-time student, yes.
23        Q.      Okay.  So I want to get into some
24   questions about some of the circumstances that
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

1    specifically caused me to ask you to come and offer

2    your remembrances of some events.

3                    Were you ever accused of violating

4    any DELJIS protocols during your tenure?

5            A.    Yes.

6            Q.    And around what time were you accused

7    of those violations?

8            A.    I think somewhere in 2006.

9            Q.    What protocol or protocols were you

10   accused of violating?

11           A.    I can't remember exactly which.  I

12   know there was one count where I was accused of

13   disseminating information.

14           Q.    Could you explain what you mean by

15   "disseminating"?

16           A.    Providing information to someone who

17   is unauthorized.

18           Q.    To access that information.

19           A.    Yes.

20           Q.    So the information that we're talking

21   about is criminal history information or some other

22   type of information?

23           A.    In this case it was criminal history

24   information, yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 21

1   training.

2          Q.    Okay.  So speaking of training, I

3   would like to ask you a couple of questions about

4   your training.

5          A.    Certainly.

6          Q.    Do you remember, if you can think

7   back prior to the accusations and that whole process

8   that we spoke of, how were you originally trained to

9   use DELJIS?

10         A.    I just remember the golden rule was

11  that you could run whoever you want, you just

12  couldn't disseminate the information.

13         Q.    So around what time did you receive

14  that training, that golden rule that you mentioned?

15         A.    It would have been when I was in the

16  Police Academy in 1998.

17         Q.    So I you were taught that you could

18  run anyone, just don't hand the information off to

19  somebody else.

20         A.    That's correct, outside of law

21  enforcement; yes.

22         Q.    Outside of law enforcement?

23         A.    Yes.

24         Q.    So when you say you could run anyone,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

1  does that literally mean anyone?  Do you remember

2  why they taught you that way?

3       A.    I don't remember why they taught us

4  that way, but I remember that you could arbitrarily

5  run people.

6       Q.    Okay.  Regarding the training that

7  you received after the I guess whatever event

8  occurred with regard to DELJIS, you said you

9  remember being required to be re-trained.

10      A.    Yes, sir.

11      Q.    Do you remember what that training

12 was like?

13      A.    I don't remember exactly what the

14 training was like.  I do know that the policy

15 changed.

16      Q.    Okay.  Do you remember how the policy

17 changed at all?

18      A.    Not specifically, but I remember that

19 as far as arbitrarily running people, that aspect of

20 the policy changed.

21      Q.    Okay.

22      A.    And I think you needed more of -- I

23 can't remember the verbiage, but more of an official

24 reason to conduct a search.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 23

1      Q.     When you say "official reason," do

2  you mean regarding your official duties or something

3  like that?

4      A.     I can't say for certain.

5      Q.     Okay.

6      A.     But I know it changed and became more

7  strict.

8      Q.     Regarding the actual investigation

9  itself, do you remember, perhaps in reviewing any

10  police reports or in any interactions you had with

11  the folks who were investigating you, do you

12  remember how they --

13      A.     I'm sorry; which investigation?

14      Q.     The whole investigation into your

15  conduct.

16      A.     Okay, okay.

17      Q.     So whether we're talking about the

18  criminal side or the IA side.

19      A.     Okay.

20      Q.     Regarding that effort, do you recall

21  how it was conducted?  Do you remember giving any

22  interviews or anything like that?

23      A.     I remember giving a statement, yes.

24  Again, it's been over ten years.  I can't remember

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 24

1    exactly what my role was in the investigation.

2         Q.    Right.   So I want to ask you a couple

3    of questions about the specific circumstances that

4    arose that you said had to do with a domestic issue

5    and then somebody accused you of something.

6         A.    Okay.

7         Q.    Could you please give me your best

8    explanation of what those circumstances were that

9    gave rise to the charges and caused all that to

10   happen?

11        A.    I just remember my girlfriend at the

12   time, she had an acquaintance from ████, and she

13   had an occasion to go over their house.   And the

14   acquaintance's husband made inappropriate remarks

15   and this is what she told me.   At one point she said

16   that she pushed -- █████████████████████████████

17   ███████████████████████████.

18             Now, before I even started dating my

19   girlfriend or formerly met her, I saw the same

20   individual at ██████.   I think a year or two prior,

21   and I recognized him as someone that I thought I had

22   arrested.   So I conducted a search of him then.   And

23   it was then that I realized that he had been

24   arrested for some type of -- I think it was sexual

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 25

1    harassment.   I can't remember the exact charge or

2    whatever.

3                    So, anyway, fast-forward two years, I

4    told my girlfriend that I didn't think she should

5    stay -- she should be around him.  She didn't heed

6    my warnings and I tried to warn her several times.

7    So I it escalated to the point where I revealed what

8    he had been arrested for.

9           Q.     Gotcha.  So to be clear in your

10   thought process and how you approached this, I want

11   to make sure I understand how that transpired.

12                   So you say that you first recognized

13   the guy when you saw him at church prior to the

14   event with the balloons happening.

15          A.     Right.  This is before I even met my

16   girlfriend.

17          Q.     Before you met your girlfriend.

18          A.     Yes.

19          Q.     So what prompted you to run him was

20   because you thought he looked familiar?

21          A.     I thought I arrested him, yes.

22          Q.     You had a prior recollection of

23   arresting him.

24          A.     Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1          Q.      So then why would you then having had

2    that prior recollection run his information?  Why

3    would you decide to do that?

4          A.      Again, based on the policy at the

5    time, it was more of a situational awareness thing,

6    I mean, I would like to know if I was around someone

7    that I arrested in the event that he recognized me

8    as well.

9          Q.      Right.  So at that time you weren't

10   investigating him for any crime --

11         A.      No.

12         Q.      -- or any violation?

13         A.      No, I was not.

14         Q.      Or any suspected crime.

15         A.      No, I was not.

16         Q.      Did you run him at any point in time

17   subsequent to that?

18         A.      Subsequent?

19         Q.      Subsequent to seeing him in ███,

20   did you run his information at any point in time?

21         A.      I think I ran him again just to be

22   sure once the situation was then with my girlfriend.

23         Q.      Right.  So at that point in time you

24   ran the information because you were concerned about

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 27

1   who your girlfriend was interacting with.

2            A.      Correct.

3            Q.      Okay.  and, again, just to be clear,

4   at the point in time that you ran that information

5   later on, you weren't running it because you

6   suspected him of committing a crime or were

7   conducting any investigation.

8            A.      No.

9            Q.      Okay.  I just want to ask you some

10  questions.

11                   This is a document that I gave

12  earlier.  If you could take a gander at that and let

13  me know if that at all looks familiar to you.

14           A.      This particular periodical doesn't,

15  but the substance does.  I think this is from the AP

16  so the wording appears familiar.

17           Q.      So does the substance of this

18  document appear accurate?

19           A.      It appears accurate, yes.

20                   MR. DELCOLLO:  Okay.  I'm going to go

21           ahead and ask this be entered in at Exhibit

22           1.

23                        -  -  -

24                   (Whereupon the court reporter marked

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 28

1          for identification purposes McDerby Exhibit

2          1.)

3                        - - -

4     BY MR. DELCOLLO:

5          Q.     I'm going to go ahead and move on to

6     another document, which is a memorandum opinion --

7          A.     Can I make one comment, if I may?

8     The indictment as legislation trooper accessed the

9     state computer obtained unauthorized information.

10    At the time when I authorized information, I wasn't

11    doing anything with the understanding that it was

12    unauthorized.

13         Q.     Understood.  So you're saying that at

14    the time that you accessed the information, that

15    there was this implication in the article that that

16    was unauthorized use of a computer system.

17         A.     It implies intent and there was no

18    intent on my part.

19         Q.     Gotcha.  So you are a he saying at

20    the time you were not attempting to misuse the

21    computer system.

22         A.     Correct.

23         Q.     Okay.  Thank you for that

24    clarification.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE

2                    - - -

3
    ANDREL MARTINEZ,          :   CIVIL ACTION
4            Plaintiff,       :
                             :
5        vs.                  :
                             :
6   THE STATE OF DELAWARE     :
    DEPARTMENT OF HOMELAND    :
7   SECURITY/DIVISION OF THE  :
    STATE POLICE; ALICE       :
8   BAILEY, in her individual :
    and official capacities;  :
9   and NATHANIEL MCQUEEN,    :
    JR., in his individual    :
10  and official capacities,  :
            Defendants.       :   NO. 1:16-cv-00564-GMS

11                   - - -

12           Monday, April 30, 2018

13                   - - -

14      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15                   - - -

16           Oral Deposition of ███████████ taken
17   at Offit Kurman, P.A., One Commerce Center, 1201
     North Orange Street, Suite 10 East, Wilmington,
18   Delaware, commencing at 11:37 a.m., before Susan
     Marie Migatz, a Federally Approved Registered Merit
19   Reporter, Certified Realtime Reporter, Certified
     LiveNote Reporter, and Notary Public.

20                   - - -

21
22           VERITEXT LEGAL SOLUTIONS
           Registered Professional Reporters
23           300 Delaware Avenue, Suite 815
               Wilmington, DE 19801
24               (302)571-0510

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 6**

1 every day. I was responsible for calling officers
2 or troopers into court, whether it be State Police,
3 Dover PD, various police agencies. And then also
4 there was what we called a police prosecution on
5 Wednesdays where I put the paperwork together for
6 police prosecution cases.
7     Q.   So what do you mean by "police
8 prosecution"?
9     A.   If a trooper writes a ticket and the
10 person pleads not guilty, then they get set up for a
11 police prosecution day on Wednesdays, it basically
12 starts at 12:30, and we tried to address/resolve
13 their cases before trial.
14     Q.   Gotcha. So you would try to talk to
15 them about do you want to settle or can we --
16     A.   Yes. If they had speeding with no
17 proof of insurance and they showed up with proof of
18 insurance, you know, the speeding, we'll drop it
19 down to 5 over, whatever it might be.
20     Q.   And you did that for about two
21 years --
22     A.   Right.
23     Q.   -- acting as liaison and preparing
24 for police prosecutions?

**Page 7**

1     A.   Yes.
2     Q.   So for which court were you the
3 liaison?
4     A.   I was in the Court of Common Pleas.
5     Q.   You were in the Court of Common
6 Pleas.
7     A.   Yes.
8     Q.   And were you in a particular county?
9     A.   Kent.
10     Q.   You were the Kent County Court of
11 Common Pleas liaison officer.
12     A.   Yes.
13     Q.   And you said for all the agencies you
14 were the liaison. So you would coordinate folks who
15 would need to testify from other agencies other than
16 the State Police; correct?
17     A.   Yeah. If the prosecutor came and
18 said, "Call in ▮▮▮▮▮▮ from Milford PD," I had
19 Milford PD's phone numbers or I had people's phone
20 numbers and I would call either that person directly
21 or call the police station and say, "Have Officer
22 Smith respond to the Court of Common Pleas for
23 trial."
24     Q.   And how was it that you were the

**Page 8**

1 court liaison for all of the police? Is that
2 something that the State Police just agree to do?
3 Do you know how it became that way?
4     A.   I guess it was like that when I
5 started there.
6     Q.   And you were, of course, an employee
7 of the State Police at the time that that was your
8 assignment?
9     A.   Yes.
10     Q.   During your performance of those
11 responsibilities did you have to access DELJIS very
12 often?
13     A.   Yeah, quite a bit. For the police
14 prosecution dates I had to run everybody's record.
15 I had a list of the calendar and whoever was
16 scheduled that week, I ran their records to see if
17 they were PBJs, whatever they might be.
18     Q.   Probation before judgment, for the
19 record.
20     A.   Yes.
21     Q.   When you say, for the prosecution
22 stuff, having to run their records, I guess you
23 needed that as you were preparing to interact with
24 them --

**Page 9**

1     A.   Yes.
2     Q.   -- regarding whatever you might
3 suggest the disposition of their matter would be.
4     A.   What's that again?
5     Q.   You would actually suggest, hey, we
6 can do this or maybe come to an agreement as to this
7 to keep them from going to trial.
8     A.   Yes, PBJ court or whatever.
9     Q.   So what about the other times that
10 weren't Wednesdays when you were doing other
11 responsibilities; did you have to use DELJIS at that
12 time for much?
13     A.   For like a regular court day for
14 Court of Common Pleas?
15     Q.   Yes.
16     A.   No.
17     Q.   Okay. What were you doing prior to
18 serving as liaison?
19     A.   I was the assistant shift supervisor.
20     Q.   And for what shift and for what
21 function? Were you with the drug unit?
22     A.   I was on the road.
23     Q.   Were you in patrol?
24     A.   Patrol.

3 (Pages 6 - 9)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 10**

1　Q.　Patrol. How long were you assigned
2　to patrol for?
3　A.　Almost my whole career, except there
4　was a time I was in community policing for maybe six
5　years, but probably from the year of '15 to whenever
6　I retired, I was on the road. So the last 11 years
7　I was -- well, prior to court liaison. So, what,
8　nine years.
9　Q.　So the majority of your career was --
10　A.　Patrol.
11　Q.　-- patrol. And during your time,
12　aside from when you were at the courthouse as
13　liaison, what troops were you assigned to?
14　A.　Troop 3.
15　Q.　Was that your entire assignment the
16　entire time?
17　A.　Pretty much. At one time the
18　community police unit was based out of headquarters
19　for basically a year. But my entire career was out
20　of Troop 3.
21　Q.　And what was the year of your
22　retirement?
23　A.　I think it's been three years. So in
24　2015 I believe it was.

**Page 11**

1　Q.　And not to strain my brain with math,
2　but maybe you can tell me, about what year do you
3　recall that you started and were you at Troop 3 the
4　entire time?
5　A.　1989.
6　Q.　And you were at Troop 3 the entire
7　time?
8　A.　Yeah.
9　Q.　Okay. During your assignment to
10　patrol at Troop 3 did you ever have an occasion to
11　interact with Mr. Andrel Martinez?
12　A.　Yeah. We were never on the same
13　shift; but, I mean, obviously we've known each
14　other.
15　Q.　Right. So you were there during a
16　time period when he was there also.
17　A.　Yeah.
18　Q.　Do you know if he was in patrol at
19　the same time you were in patrol?
20　A.　I think when he first came up, he was
21　in the drug unit.
22　Q.　Okay.
23　A.　Then he came out of the drug unit and
24　came to patrol --

**Page 12**

1　Q.　Understood.
2　A.　-- if I remember correctly.
3　Q.　So there was a period of time during
4　your tenure at Troop 3 that Mr. Martinez was also
5　assigned to Troop 3.
6　A.　Yes.
7　Q.　Do you remember what years they were?
8　A.　No.
9　Q.　Okay.
10　A.　I mean, I can speculate. It was 2005
11　maybe to 2010, somewhere in there. That's what I'm
12　guessing.
13　Q.　That's your general remembrance of
14　the time frame.
15　A.　Yeah.
16　Q.　Okay. Regarding your time at the
17　State Police, was there ever an occasion that you
18　were accused of misusing or violating DELJIS
19　protocols?
20　A.　That's pretty much why I retired.
21　Q.　Could you please explain the
22　circumstances of that for me? Who accused you and
23　what happened?
24　A.　There's a former girlfriend and I had

**Page 13**

1　met somebody else, started dating somebody else.
2　She found out who that person was and she contacted
3　them via Facebook, I'm assuming, or I'm pretty sure
4　it was that way.
5　　Basically while I was dating another
6　girl, I had an affair or had a weak romance with the
7　ex-girlfriend; and then when I left the house that
8　morning, she said, "I'm going to tell your new
9　girlfriend everything that's transpired this week."
10　　So when everything blew up, then she
11　had started seeing another guy.
12　Q.　Who's "she," your ex or the new
13　girlfriend?
14　A.　My ex, ▮▮▮▮▮.
15　Q.　So she started seeing someone new.
16　A.　Well, she had started seeing him
17　prior to this, but she just, I guess, wanted to
18　terminate the relationship I was having with the new
19　girl.
20　Q.　Gotcha.
21　A.　And I guess as things went along, you
22　know, I couldn't figure out who her new boyfriend
23　was. I ended up finding out who he was and I ran
24　his name three times and I apparently I ran her name

4 (Pages 10 - 13)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 14**

1 four times.
2    Q.    And those are the specific runnings
3 of names, if you will, that led to the accusations
4 of wrongdoing regarding DELJIS use?
5    A.    Well, no. There was a little
6 altercation at a bar one night and that translated
7 into the IA investigation, I guess.
8    Q.    So the altercation at the bar led
9 into an IA investigation.
10   A.    Yes.
11   Q.    And I guess somewhere in the course
12 of that investigation alleged DELJIS impropriety
13 arose.
14   A.    Yes.
15   Q.    Okay. So no one actually accused you
16 outright of doing something wrong with DELJIS. It's
17 not like there was a complaint that came in, to your
18 knowledge.
19   A.    Well, she filed a complaint.
20   Q.    About DELJIS?
21   A.    Yeah.
22   Q.    Okay.
23   A.    That was one of them.
24   Q.    Okay. So let me make sure I

**Page 15**

1 understand then. So she, being the ex-girlfriend --
2 correct?
3    A.    Yes.
4    Q.    -- accused you of doing something
5 wrong with her criminal history information?
6    A.    Yes.
7    Q.    And what was that accusation?
8    A.    Well, okay. There were pictures that
9 she had sent me, you know, she had sent me some
10 pictures, and, you know, during this bar fiasco I
11 showed them to one of her guy friends and then he
12 went and told her, you know, he's showing pictures
13 of you.
14        And then I guess there was pictures
15 and then one of her friends had told her that, you
16 know -- or I don't know where she came up with the
17 idea of the DELJIS violation, but she did.
18   Q.    Okay. So the bar issue had at least
19 two items that I'm hearing. One was perhaps some
20 allegations about improperly showing someone some
21 pictures --
22   A.    Yeah.
23   Q.    -- and another one was DELJIS use.
24   A.    Yes.

**Page 16**

1    Q.    Is there anything else from the bar
2 that arose from that? Any charge of getting
3 involved in a physical confrontation or anything
4 like that?
5    A.    Me and the new boyfriend, you know,
6 like bumped shoulders or I bumped into him, so that
7 was part of it, too. But as far as when I went to
8 the Internal Affairs investigation or when the
9 Internal Affairs investigation started, he wasn't
10 pursuing anything.
11   Q.    So he didn't pursue anything like
12 offensive touching or assault against you?
13   A.    No.
14   Q.    So what was being addressed were some
15 type of charges involving pictures and another set
16 of allegations involving misuse of DELJIS.
17   A.    Yes.
18   Q.    And that all arose from this bar
19 situation.
20   A.    Yes.
21   Q.    Were there any other charges or
22 allegations about misconduct arising from that
23 situation?
24   A.    No, not that I know of.

**Page 17**

1    Q.    Was there anything else related to
2 this circumstance with your ex-girlfriend that led
3 to an IA investigation by your employer?
4    A.    No.
5    Q.    Were there any other criminal
6 investigations stemming from that circumstance?
7    A.    Not that I --
8    Q.    So this was the sum total?
9    A.    Yeah, there was the showing of
10 pictures and DELJIS.
11   Q.    Okay. So regarding the picture
12 issue, were you ultimately charged with anything?
13 Was there a criminal side to this as well as an IA
14 side?
15   A.    Yeah.
16   Q.    So what were you charged with?
17   A.    Official misconduct.
18   Q.    With regard to the pictures?
19   A.    No; DELJIS.
20   Q.    With regard to DELJIS you were
21 charged with official misconduct. Was there any
22 charge forthcoming with regard to showing someone
23 the pictures?
24   A.    I mean, not that I know of. Just

5 (Pages 14 - 17)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 18**

1 basically there was two things and I ended up
2 pleading to the official misconduct.
3     Q.  So you pled guilty to something?
4     A.  I took a PBJ to official misconduct.
5     Q.  To official misconduct. And that was
6 during the course of the criminal investigation.
7     A.  Yes.
8     Q.  So to your understanding, there were
9 no actual criminal charges that arose from showing
10 her friend the pictures on your phone.
11     A.  No.
12     Q.  Okay. To focus then for a moment on
13 the criminal side and the DELJIS use, what time
14 frame about, was it three years ago that you were
15 charged and pled?
16     A.  Yes.
17     Q.  So were you accused or alleged to
18 have somehow accessed information improperly or were
19 you accused of dissemination or both?
20     A.  I believe it was access.
21     Q.  Okay.
22     A.  That I looked him up three times and
23 I had looked her up four times. And the four times
24 I know, from what I can remember, I can't remember

**Page 19**

1 the exact dates, but a couple of hers were when we
2 were actually dating because I helped her -- well, I
3 resolved some ticket issues for her.
4     Q.  You attempted to help her --
5     A.  Yeah.
6     Q.  -- involving some tickets that she
7 had?
8     A.  Yes.
9     Q.  Around what time did that occur, the
10 specific assistance you were trying to offer, if you
11 remember?
12     A.  I think she had a couple parking
13 tickets with Dover PD, and I can't remember. About
14 a year before all this stuff happened.
15     Q.  A year before the events that
16 resulted in the charges.
17     A.  Yes.
18     Q.  Okay. So that was one of the
19 occasions that you were charged with? Was that one
20 of the unlawful occasions of access that you were
21 charged with?
22     A.  Well, they just said that there were
23 seven times that I ran, three on him and four on
24 her.

**Page 20**

1     Q.  Okay. And on him, do you remember
2 when you had done those accesses, when they
3 occurred? Was it after the bar event or before?
4     A.  Before.
5     Q.  Okay. Regarding any repercussions
6 with respect to your DELJIS access, I understand you
7 entered into a PBJ, and is it fair to say or
8 accurate to say that that totally resolved the
9 criminal aspect of your case?
10     A.  Yes.
11     Q.  Okay. Was there any type of hearing
12 before DELJIS regarding your DELJIS access that you
13 can recall?
14     A.  There was one scheduled. I didn't go
15 to it.
16     Q.  So you didn't attend.
17     A.  No.
18     Q.  Do you know if it went forward?
19     A.  I believe so, yeah.
20     Q.  Do you have any idea what the outcome
21 of that hearing was?
22     A.  From my understanding, I was
23 suspended for two years.
24     Q.  From accessing DELJIS?

**Page 21**

1     A.  Yes.
2     Q.  Okay. Now, with regard to any sort
3 of IA investigation, was there an investigation that
4 occurred through Internal Affairs as well?
5     A.  No. I retired.
6     Q.  You retired. So there was no IA
7 investigation?
8     A.  Yeah.
9     Q.  Okay. Do you know if there were any
10 repercussions regarding your certification through
11 the Council on Police Training?
12     A.  Yeah. I didn't appear at that
13 hearing either.
14     Q.  Do you know what the outcome of that
15 was?
16     A.  I'm not a certified police officer
17 anymore.
18     Q.  So you are no longer holding that
19 certification.
20     A.  No.
21     Q.  The timing and how many years you had
22 been there, at the time that you retired, you
23 already had 26 years?
24     A.  Yes.

6 (Pages 18 - 21)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 22**

1  Q.  Okay. With respect to the way that
2  you were charged, do you have any sense of why it
3  was that they charged you with official misconduct
4  as opposed to, say, seven counts of improper access
5  of criminal history information?
6  A.  I mean, I guess between my attorney
7  and the Attorney's General Office, you know, they
8  worked out whatever they did.
9  Q.  Do you know if you were ever charged
10  with counts of improper access of criminal history
11  information or it was only the one charge for
12  official misconduct?
13  A.  It was one charge of official
14  misconduct.
15  Q.  So to your recollection that's the
16  only thing you were ever charged with?
17  A.  Yes.
18  Q.  Okay. Do you know who it was that
19  conducted the criminal investigation into what
20  happened, which officer conducted it?
21  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22  Q.  ▓▓▓▓  And who did you interact
23  with, if anyone?
24     Well, you said no IA occurred, but

**Page 23**

1  did anyone interact with you from IA at all?
2  A.  Well, once I got suspended, my
3  attorney, Mr. Ligouri, handled pretty much
4  everything.
5  Q.  Gotcha. So he maybe was interacting
6  with IA, but you never did.
7  A.  No.
8  Q.  Okay. Now, regarding the DELJIS, did
9  anyone ever reach out to you or try to talk to you
10  about your DELJIS use? Did you ever give any
11  statements?
12  A.  I mean, no. I mean, no.
13  Q.  So you never gave any statements to
14  anyone that maybe was a DELJIS investigator and you
15  never gave any statements to anyone who was
16  investigating your case for the State Police?
17  A.  No.
18  Q.  Okay.
19  A.  Everything was gone through my
20  attorney.
21  Q.  Everything went through your
22  attorney.
23  A.  Yeah.
24  Q.  Regarding your access, do you know

**Page 24**

1  whether or not there was any effort by the folks who
2  were running the investigation to review more of
3  your access information or was everything, to your
4  knowledge, focused on the seven accesses?
5  A.  I'm guessing just the seven accesses.
6  I don't know.
7  Q.  Okay. So ultimately you chose to
8  retire.
9  A.  Yes.
10  Q.  Is that something you chose to do or
11  did someone tell you, "Hey, we're either going to
12  try to terminate you or you can retire"? How did
13  that come about?
14  A.  I just retired.
15  Q.  You just tendered your resignation.
16  A.  Yeah. I mean, basically ▓▓▓▓▓▓▓
17  was like the girl --
18     MR. McTAGGART:  No, you don't have to
19     testify about any communications from your
20     lawyer.
21     THE WITNESS:  Oh, okay.
22  BY MR. DELCOLLO:
23  Q.  So you just tendered your
24  resignation.

**Page 25**

1  A.  Yes.
2  Q.  Okay. I am going to ask you about a
3  couple of documents that I have here.
4     Would you please review that for me
5  and, when you've had the occasion to, let me know
6  that you're finished?
7  A.  Okay.
8  Q.  Have you ever seen this document
9  before?
10  A.  No.
11  Q.  Have you ever seen documents like it
12  before?
13  A.  Not really, no.
14  Q.  The description that's on the second
15  page, it notes your name, ▓▓▓▓▓▓▓ That is
16  your name; correct?
17  A.  Correct.
18  Q.  There are dates there and there is a
19  waiver of indictment information, there is a plea
20  hearing, and it indicates that there was a guilty
21  plea and probation before judgment and then there
22  was a waiver of indictment signed by defendant.
23     Is that a fair recitation of what
24  happened regarding the criminal side of the case?

7 (Pages 22 - 25)

# In The Matter Of:

*Martinez v.*
*State of Delaware Department of Homeland Security*

███████████

*April 16, 2018*
*Confidential - For Attorneys Eyes Only*

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone: 302-655-0477, fax: 302-655-0497*



**WILCOX & FETZER LTD.**

Original File Martinez v. State of DE 04-16-18 depo of ███████████ Confidential.txt
Min-U-Script® with Word Index

MARTINEZ APPENDIX 000064

1  criminal laws?

2      A.    To an extent.

3      Q.    And you also have to go over the

4  DELJIS rules, don't you?

5      A.    This was outside of the academy, to

6  the best of my recollection.

7      Q.    When were you first given any

8  training on DELJIS?

9      A.    I received some training in DELJIS,

10 very minor training, when I was with the

11 Rehoboth Police Department.  I don't believe

12 it was anything official.

13     Q.    How about with DSP?

14     A.    DSP, to the best of my recollection,

15 was a 40-hour curriculum through the DELJIS

16 department.

17     Q.    And when you are in the academy, are

18 you considered a cadet?  Is that the right

19 term?

20     A.    A recruit.

21     Q.    And you're a recruit until you

22 graduate from the academy?

23     A.    I believe you're still referred to

24 as a recruit while on FTO.



Confidential - For Attorneys Eyes Only          10

1    Q.    On FTO?

2    A.    Yes.

3    Q.    That's where you're assigned a field

4    training officer?

5    A.    Yes.

6    Q.    For how many weeks?

7    A.    I believe it was 12.

8    Q.    And you ride in the police car with

9    the senior officer on FTO?

10   A.    You are actually on patrol and the

11   FTO officer is next to you.

12   Q.    And you're on duty at that point?

13   A.    Correct.

14   Q.    You can make arrests?

15   A.    Correct.

16   Q.    By the time you were on FTO, you

17   would have had to have received the DELJIS

18   training, correct?

19   A.    I received the DELJIS training by

20   the time I was on FTO, yes.

21   Q.    Do you remember where you received

22   the DELJIS training?

23   A.    My recollection is that it was off

24   of Silver Lake Road off of Walker Road, I

Confidential - For Attorneys Eyes Only                    11

1   believe, in Dover.

2       Q.      Was it you, other recruits?   Who

3   went there?

4       A.      Our class was large, so they split

5   us up in different groups.

6       Q.      But it was your academy class?

7       A.      Different groups within the academy.

8       Q.      Who instructed you?

9       A.      ███████████████████

10      Q.      And you mentioned earlier that you

11  reviewed DELJIS directive number 1?

12      A.      Yes.

13      Q.      Were you instructed on DELJIS

14  directive number 1 when you went to the

15  DELJIS class?   Would this have been in 1998?

16      A.      I believe DELJIS was sometime toward

17  the end of my academy, so it may have

18  stepped over into the beginning of 1999.

19              As far as DELJIS policy

20  number 1, I cannot say for certain what the

21  policy was at that particular time because I

22  have no record of signing any directives

23  prior to 1999 that I recall at this point.

24      Q.      What about the training, do you



Confidential - For Attorneys Eyes Only                    12

1 | remember anything from this training about

2 | what they taught you in terms of when you

3 | could use the DELJIS system?

4 |    A.    I do.

5 |    Q.    What did they tell you?

6 |    A.    I recall during my training that we

7 | ran multiple names, any name that we wanted

8 | to, they would permit us to look at anyone

9 | that we could think of.  They instructed

10 | us --

11 |    Q.    This is during the training?

12 |    A.    During the training.  To play with

13 | the system, to get to know the system.  The

14 | system was constantly evolving, that there

15 | was going to be new additions, new upgrades,

16 | that you would never know the system unless

17 | you quote/unquote play with it.

18 |            One of the standout remarks that

19 | I recall during my training in DELJIS was

20 | specifically from J██████████, and that ██████

21 | ██████ comment was basically run everybody,

22 | let God sort them out.  And that was stated

23 | in a jovial, some sort of jocularity, so to

24 | speak, within the class.

**W&F**
WILCOX & FETZER LTD
MARK T. INDYK, APPENDIX 000068
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Confidential - For Attorneys Eyes Only                13

1          The biggest thing that I recall

2    from the training and have always adhered to

3    is that you don't disseminate the

4    information, meaning you don't provide the

5    information to anyone else.

6      Q.     Did you take any other training on

7    the use of DELJIS after that?

8      A.     I don't recall.  I don't believe so.

9    I don't recall.  It's been so long.

10     Q.     Just so we're clear on this, the

11   DELJIS system, can you describe the system?

12     A.     Can you be more specific?

13     Q.     What is it?

14     A.     What is the system?

15     Q.     Yeah, what is it?

16     A.     The DELJIS system houses multiple --

17   to me, DELJIS is an umbrella.  It houses

18   multiple masks or screens from criminal

19   history to DMV to many different things.  It

20   was evolving.  It is the repository for

21   basically all information that is gathered

22   from previous state agencies in Delaware.

23     Q.     The DMV information includes license

24   plates; is that right?



Confidential - For Attorneys Eyes Only                52

1    motor vehicle information on people?

2        A.      Well, I would have done -- if it was

3    a DMV registration check, then obviously my

4    next move was to do the mask for criminal

5    history.   That was the day I had done all my

6    DELJIS checks.   Was I specifically running

7    through ███████████████?   Yes and no.

8    ████████████ lived approximately 150 yards

9    from my house.   There is nothing out of the

10   ordinary to see activity in the parking lot,

11   and I know I did see activity in the parking

12   lot on certain dates, I can't recall the

13   exact dates, where I did drive through the

14   parking lot.

15              I know that the intersection

16   that our primary roadway for egress and from

17   our residences had construction, and

18   therefore I had to take the long way through

19   her development at least on one particular

20   instance because I couldn't get to my

21   residence.   So did I drive through ███████

22   ████████?   Yes, I did.

23       Q.     So your testimony is that on these

24   dates, that your house was 150 yards from

**Confidential - For Attorneys Eyes Only**          53

1   ███████████████ house?

2      A.     Yes.   I drove by ████████████████

3   house or apartment every day that I had to

4   go to and from work or even have access to

5   Route 1 from my residence.

6      Q.     How about through the parking lot?

7   You drove through the parking lot every day?

8      A.     I advised that I saw activity in the

9   parking lot.   Did I drive through her

10  specific parking lot every day?   No.

11     Q.     Now, you're driving through.   Let's,

12  for example, here look at 9/22/13.   You're

13  driving through here at 1:31 in the morning.

14     A.     Correct.

15     Q.     What was your shift at that time?

16     A.     I don't recall.   I imagine it would

17  be night shift.

18     Q.     Which would be what?

19     A.     6:00 p.m. to 6:00 a.m. or 7:00 p.m.

20  to 7:00 a.m.

21     Q.     So you would be on duty?

22     A.     Say that again?

23     Q.     Would you be on duty when you were

24  running these tags?



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

60b74b92 Appendix 000071

Confidential - For Attorneys Eyes Only                               54

1     A.     Specifically working on duty?   To

2   the best of my recollection, it would have

3   been working on duty, a pay job, could have

4   taken a medical transport.  I can't tell

5   you.   I don't have that in front of me what

6   I was working on that particular date.

7     Q.     Let's look on 9/22, you were -- do

8   you have any idea why you ran these people

9   on 9/22?   Fourteen people that were run on

10  9/22 between 1:31 and 2:44 a.m.

11    A.     Is there specific registrations?

12    Q.     They're just names listed.

13    A.     They're just names listed?  I can't

14  tell you -- I can't give you a specific

15  reason why each one of those names were run.

16    Q.     Go to page 9.  Would it be the same

17  explanation for this, as well, you can't

18  give me a specific reason why these names

19  were run, the ███████████████?

20    A.     Again, as I look at these, I knew I

21  went through ███████████████   My best

22  recollection was that these more specific

23  nights with more names run were probably the

24  nights that I saw activity within the

parking lot and/or I know I followed two individuals suspected of DUI into the development.

Q. What other activity did you see in there?

A. I think it was just generally a property check, people out and about in the parking lot.

Q. Where was your address at?

A. My address at the time was [redacted] Street.

Q. Was there a PFA in place between you and [redacted]?

A. No.

Q. When did the PFA start?

A. I believe her PFA started in January of 2013 -- I'm sorry, January of 2014, and then was dismissed within a month.

Q. So your status as of the beginning of 2013 with [redacted], you were separated?

A. [redacted] and I separated March of 2013.

Q. And it's your testimony that for you

Confidential - For Attorneys Eyes Only                    62

1    some point.

2        Q.    Let me read you the next sentence.

3    "As plaintiff's ex-girlfriend lived down the

4    street from him at that time, he conducted

5    these checks consistent with his prior

6    training in the use of DELJIS to ensure the

7    safety of his family."

8              Is that true?

9        A.    Yes, sir.

10       Q.    So you were using DELJIS to ensure

11   the safety of your family; is that true?

12       A.    That is consistent with my training.

13       Q.    And you were obtaining a benefit

14   from the use of DELJIS; isn't that true?

15       A.    Sir, if I stop a car and I'm shot

16   and didn't run the individuals, that would

17   have been my fault.  I spent many years

18   undercover.  I was threatened.  I worked on

19   federal cases involving high profile

20   criminal acts.  My safety is the number one

21   thing that I have to keep in mind when I did

22   my job as a trooper.  I was a trooper 24

23   hours a day.

24       Q.    Let me ask you a question about page



Confidential - For Attorneys Eyes Only                63

1   11.   Can you turn to page 11 of this

2   document?   There's a list of names here of

3   people that were run in the system.   If you

4   could go down to ██████████.   Do you see

5   that name?

6      A.     I do.

7      Q.     It says ██████████ was a New

8   York state trooper, and his name was run by

9   you on four different dates.   Do you

10  remember running a New York state trooper in

11  the DELJIS system?

12     A.     I couldn't have run a New York state

13  trooper in the DELJIS system unless it was

14  an individual or a name that was brought to

15  my attention in Delaware.   Did I run the

16  name ██████████?   Yes.   You're assuming

17  that that is the same individual that

18  ██████████ is associated with.

19     Q.     What about ██████████, New York

20  sheriff?

21     A.     It's the exact same thing.

22  ██████████ could have said anybody that I

23  ran that the state police could not link to

24  a police report was an associate of hers.



Confidential - For Attorneys Eyes Only

64

1    Q.    So you're saying that just because

2   ████████████████ or ████████████ showed up as

3   a person that you ran doesn't mean that

4   that's a person that is somebody that

5   Ms. Loiselle knows; is that your testimony,

6   sir?

7    A.   . If I was going to run somebody from

8   out of state specific to ████████████, I

9   would have had to do it some other way, not

10  through DELJIS.

11    Q.    That's assuming that you knew that

12  they lived in New York, right?

13    A.   .If I knew.

14    Q.    How about at the bottom here, ██████

15  ████████, why did you run ██████████████?

16    A.   ██████████ was the sex offender

17  that I was notified about.

18    Q.    Let's go to the next page. ████████

19  ███████. Why did you run ████████████████?

20    A.   ████████████ was the daughter of

21  █████████. ██████████████was someone that

22  I saw on several occasions when we met to do

23  our exchange of our daughter. ████████████

24  was familiar to me. My recollection of

**W&F**
WILCOX & FEITZER LTD.
MARTINEZ APPENDIX 000076
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Confidential - For Attorneys Eyes Only                65

1    ███████████████ was that she was present at a

2    particular drug buy that I did in the

3    Milford area for marijuana.

4        Q.    When was that?

5        A.    I don't recall the exact date.   But

6    she was part of the younger crowd of kids

7    that were running around and selling pot at

8    that particular time.

9        Q.    If you look at the notes here for

10   ███████████████ it looks like you ran her

11   name eight times; does that look correct,

12   between July of 2012 and November of 2013?

13       A.    Yes, I think some instances I had

14   run her tag or come across her.   But S█████

15   ███████████ and I, and I want to be specific

16   with the 7/12 date, because I do recall

17   ███████████████ was at my home, she still

18   hadn't transferred her registration from the

19   State of New York to Delaware, and she was

20   concerned because she had received some sort

21   of notification from New York that her

22   registration or her license would be

23   suspended.   So I checked her Delaware

24   driver's license and she was fine, and that

Confidential - For Attorneys Eyes Only     117

```
1      Q.    Did you report it to IA?

2      A.    No.

3      Q.    Do you know the underlying facts of

4    these other cases, ██████████ case?  Do

5    you know the underlying facts of what

6    happened?

7      A.    I do now.

8      Q.    You do now?

9      A.    I have a general understanding of

10   it.

11     Q.    And it's your belief that these

12   people did the same or similar to what you

13   did?

14     A.    Correct.

15     Q.    And you were present the other day

16   when ████████████ was asked whether or

17   not he ever made the statement, quote, I

18   need you to talk to your wetback buddies to

19   see what they want.  Did you see his

20   reaction to that question?

21     A.    I did see his reaction.

22     Q.    Did he actually say that?

23     A.    He did.

24     Q.    He did?
```



Confidential - For Attorneys Eyes Only          118

1    A.    He did.

2    Q.    Did you hear him say that he has

3  Hispanic relatives in his family?

4    A.    All the more reason why he was so

5  comfortable saying that to me.

6    Q.    He said that to you?

7    A.    Yes.

8    Q.    Did you report him, the sergeant, to

9  the state police?

10    A.    No.

11    Q.    You also allege in here that ████████

12  said to you on March 14th that, quote, you

13  ought to know better, this isn't a Hispanic

14  woman you dated and she won't put up with

15  you.  Is that your testimony under oath?

16    A.    Correct.

17    Q.    You also have in here, on numerous

18  occasions, anonymous individuals would place

19  coupons for Taco Bell in your mailbox.  Is

20  that true?

21    A.    Regularly, yes.

22    Q.    And you never reported that?

23    A.    No.

24    Q.    Paragraph 23, you say that Detective



WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Confidential - For Attorneys Eyes Only                   119

1     ███████████hung up a picture of you on the

2    wall, a DELJIS picture, with a mustache.   Is

3    that your testimony?

4       A.    It was not a DELJIS picture, but it

5    was a -- actually, I take it back.   It was

6    my DELJIS DMV photograph superimposed onto

7    another photograph.

8       Q.    Did you complain about that?

9       A.    No.

10      Q.    You also say that ███████████made

11   numerous and various comments about your

12   racial background --

13      A.    He did.

14      Q.    -- when preparing for a promotion.

15   Did you ever complain about that?

16      A.    No.

17      Q.    When were you married the first

18   time?

19      A.    I was married 2000 to 2005 was when

20   we separated.   I don't recall when we filed

21   for divorce; I think it was a few years

22   later.

23      Q.    Was Detective ████████ invited to your

24   wedding?



Confidential - For Attorneys Eyes Only        140

1   General, there he is, walking into a room

2   instead of there's Corporal Martinez,

3   there's Andrel Martinez.

4      Q.    Can you explain how those comments

5   were made?  I want to make sure the record

6   is clear.

7      A.    The way I perceived those particular

8   comments were during opportune moments.  I

9   wouldn't say they were in any form of

10  jocularity throughout the day.

11     Q.    So you didn't get the impression

12  they were joking with you or doing something

13  like that?  You used the word jocularity.

14     A.    Correct.  I was offended; I just

15  chose to keep my mouth shut.

16     Q.    You mentioned during your prior

17  testimony that you hadn't reported these

18  incidents, whether it was the way you were

19  asked to translate or the pictures on the

20  wall or the Taco Bell coupons.  Why didn't

21  you do that?  Why didn't you make reports of

22  those?

23     A.    I was afraid that I potentially

24  could have been retaliated against.  I



1  didn't want to bring bad light to the

2  troopers who one day could potentially save

3  my life maybe or that I would have to do the

4  same for theirs.   I kept my mouth shut.   I

5  have thick skin.   I moved on with my life

6  day to day.

7      Q.    The comments about being on the taco

8  circuit when seeking out a promotion, do you

9  remember those comments?

10     A.    Yes.

11     Q.    Do you remember who made them and

12  how often?  Was it more than one person?

13  Could you explain the circumstances

14  surrounding that?

15     A.    That was Detective ████████████

16  commentary about me getting my books for the

17  promotional process, that I was right on the

18  taco circuit.

19     Q.    Did he make those comments

20  throughout the course of your seeking a

21  promotion, or was it one specific occasion

22  that comes to mind?

23     A.    I believe it was on more than one

24  occasion.   There was throughout, I think



Confidential - For Attorneys Eyes Only                159

1    Q.    What about around the police troop

2    that you were stationed?   Let's start there.

3    A.    When I was at Troop 3, this is where

4    it was -- sorry, I take it back.   I'm going

5    to go chronologically.   When I was in patrol

6    at Troop 4, there was issues with regards to

7    pornographic materials that were being

8    printed out by various individuals at the

9    troop.   There was DELJIS photographs being

10   superimposed onto individuals and various

11   poses, various stages of undress.   It was

12   happening often, and it was used as a toy.

13   Q.    And you said at Troop 4, during

14   patrol?

15   A.    Yes.

16   Q.    And do you remember where these

17   images were located?   How did you become

18   aware of that occurring?

19   A.    Apparently a printer jammed up in

20   the secretary's office, and the next morning

21   when she came in, there were several,

22   several pictures that popped up when she

23   cleared the jam.   And as a result, the troop

24   commander brought all of us in individually



Confidential - For Attorneys Eyes Only

160

1 and just said stop printing pornographic

2 images, have you ever seen this before?

3 That was the end of it.

4    Q.    So you mentioned DELJIS photographs

5 being superimposed over pornographic images.

6 How did you know that there were DELJIS

7 photos involved, and where did you see the

8 superimposed images?

9    A.    They were posted inconspicuously.   A

10 lot of that stuff was posted in the offices

11 throughout the troops.

12    Q.    Specifically Troop 4.

13    A.    That was Troop 4 at that time.   How

14 do I know they were DELJIS photographs?   You

15 can tell what a DELJIS photograph looks

16 like.   A DMV photograph for an adult person

17 has a blue background when it's printed in

18 color; a DELJIS criminal arrest photograph

19 has a gray background.   These photographs

20 were different colors, different, you know,

21 different prints, but you could tell what a

22 DMV photograph looked like.

23    Q.    Were the DMV photographs of random

24 individuals?   Who were the DMV photographs



Confidential - For Attorneys Eyes Only                161

1  of?

2     A.     They were normally photographs of

3  troopers, but I have also seen throughout

4  the course that if there is an individual

5  that is unsavory or somebody doesn't like,

6  there are times that their photographs or

7  their criminal histories with their

8  photographs are printed out, tacked up on

9  the wall, and there will be prints or

10  memes -- I don't know if he understands what

11  a meme is -- with some sort of joke, some

12  sort of statement.  And it's not like it's

13  public information.  They're specifically

14  put out and printed out because somebody is

15  being made fun or somebody is being

16  chastised.

17     Q.     So the DMV photographs -- and I'm

18  asking a question specifically in time about

19  Troop 4 and what you witnessed there.  The

20  DMV photographs, how would they be accessed?

21     A.     They would be accessed through

22  DELJIS, through the web page.

23     Q.     And who was the troop commander at

24  that time, do you recall?



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

MARKMAN APPENDIX 000085

Confidential - For Attorneys Eyes Only                162

1    A.    There was photographs, that

2  pornographic stuff I believe occurred during

3  ██████████ s tenure.

4    Q.    What about after that, did you ever

5  see photographs from DELJIS printed out and

6  posted in various locations throughout other

7  troops during your tenure?

8    A.    Yes.  I know my DELJIS photograph

9  was printed out and posted in the drug unit

10 office.

11   Q.    Where was that and when?

12   A.    Milford.

13   Q.    What troop?

14   A.    It's not a troop, it was just the

15 SIU office.

16   Q.    And what timeframe was that?

17   A.    It was shortly after I tried out for

18 the SWAT team.

19   Q.    What else?  Do you recall anything

20 at Troop 3?

21   A.    At Troop 3, an entire -- at Troop 3,

22 it happened in the drug unit.  I mean, we

23 would go to various troops, we'd go up to

24 New Castle County.  It happened more often

Confidential - For Attorneys Eyes Only                163

1    than not.

2      Q.     Try to focus specifically on Troop

3    3.  What do you recall seeing at Troop 3?

4    And if you could give a sense of the timing

5    of when you saw these in terms of the year,

6    the month if you can recall?  What sort of

7    things did you see?

8      A.     The first few years I was assigned

9    to the drug unit, I traveled between the

10   Milford office and Troop 3.  So I didn't per

11   se have an office at Troop 3, but I would

12   interact, go interact with the road guys

13   upstairs, or I'd go interact with the CI

14   guys downstairs, or I'd interact with the

15   governor's task force people when they were

16   upstairs, as well.  But there would be

17   photographs of troopers just posted in

18   conspicuous places with a mustache drawn or

19   a goatee drawn, black eyes.  It was

20   happening often.

21            I know that when I did my

22   temporary assigned duty in the criminal

23   investigation unit downstairs, that that

24   entire unit at one point or another had



Confidential - For Attorneys Eyes Only     164

1   somebody, or they colluded to do it, had run

2   each other's names ranging from Sergeant

3   ██████████ all the way to Sergeant ███, to

4   Sergeant ██████, and even █████████████ who

5   was a lieutenant, and had memes or

6   photographs or some sort of jovial jokes

7   about individuals, you know, these troopers

8   just posted throughout different areas of

9   the downstairs basement, all over the walls,

10  the bulletin boards.  I think there was one

11  bulletin board in there, but they were

12  cubicles, but they weren't cubicles in the

13  sense of four walls.  It was the brick wall,

14  then the cubicle separating this office from

15  the next, so everything was out in the open.

16      Q.    Again, regarding the photographs or

17  the information that was printed and posted,

18  where would that have been obtained from?

19      A.    DELJIS.

20      Q.    And who would have seen, amongst the

21  employees at the police troop with the

22  basement -- this was Troop 3, correct?

23      A.    Yes.

24      Q.    Who would have seen those



Confidential - For Attorneys Eyes Only          165

1   photographs?

2              MR. McTAGGART:   Object to form.

3              THE WITNESS:   I know that anyone

4   that walked downstairs for any reason,

5   whether it was to go to the bathroom

6   privately in the men's locker room, to use

7   the shower, to talk to any of the

8   detectives, including the supervisor, anyone

9   that went downstairs would have seen those

10  photographs at one point or another.   I know

11  that the supervisors -- there's no way that

12  the supervisors did not know it was going

13  on, because it was their pictures that also

14  showed up on these memes.

15              And if I remember right,

16  somebody took, and correct me if my movie

17  information is wrong, but █████████████████

18  I believe is the sheriff from one of those

19  older movies, Smokey and the Bandit, I

20  believe it was ███████████████ or Sergeant

21  ████████face superimposed on that guy.

22  BY MR. DELCOLLO:

23     Q.   How would you characterize, having

24  reviewed the policies for DELJIS and

Confidential - For Attorneys Eyes Only          166

1   understanding the definitions that were used

2   in your case, how would you characterize the

3   use of these photographs and the criminal

4   history information you referenced?

5                   MR. McTAGGART:   Object to form.

6                   THE WITNESS:   Everything that

7   they did with what I know for now is

8   supposed to be wrong.

9   BY MR. DELCOLLO:

10      Q.      Was there any business purpose that

11   you could see for these activities?

12      A.      None.

13      Q.      Are you aware of anyone being

14   investigated for viewing these things?

15      A.      Not until after my situation

16   happened, that I knew that there was some.

17      Q.      Do you ever recall during your

18   tenure any of your shift supervisors or the

19   commanders of the troops pulling people

20   together and saying this has to stop or this

21   is incorrect use of this stuff?

22      A.      No.   And as I understand it, it's

23   still occurring.

24      Q.      Regarding ████████    -- I'm going



Confidential - For Attorneys Eyes Only                167

1    to turn to the complaint for a moment.   In

2    Paragraph 10 of the complaint, it says,

3    "Upon information or belief █████████████,

4    who was plaintiff's direct supervisor, made

5    the decision to suspend his employment."

6    Was that your understanding of who made the

7    decision at the time?

8                MR. McTAGGART:   Objection to

9    form.

10               THE WITNESS:   I don't know who

11   made the decision.   All I know is I went to

12   my immediate supervisor, who was ███████

13   ████████, I requested that I please be

14   reinstated with pay and benefits, that the

15   case had been resolved, and I was told I

16   have to get back to you.

17   BY MR. DELCOLLO:

18        Q.    Did you ever receive any letters

19   that were signed by █████████████?

20        A.    No.   What I did notice is that I

21   went to Troop 7 on a particular instance,

22   and ███████████████ seemed to -- I wasn't

23   allowed to go to my mailbox to retrieve any

24   of my belongings in my mailbox, and she

**W&F**
WILCOX & FETZER LTD
PLAINTIFF APPENDIX 000091
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1  ushered me out as fast as she possibly

2  could.

3      Q.      So do you not remember a suspension

4  notice without pay that was given to you or

5  authored on or about March 18, 2014?

6                  MR. McTAGGART:  Object to form.

7                  THE WITNESS:  The best

8  recollection -- I'm not sure what you're

9  asking me.

10  BY MR. DELCOLLO:

11      Q.      I'm going to ask you to review

12  number 10, I'm going to ask you questions

13  about paragraph number 10 in the complaint.

14                  Have you reviewed it?

15      A.      Yes.

16      Q.      Do you recall ever receiving any

17  notices or letters that were signed by

18  ████████████?

19      A.      The only notice that I received with

20  regards to ██████████████ having her

21  signature on it was the notice of suspension

22  that I received on January the 17th of 2014.

23  That's the only one that I recall.

24      Q.      So that notice of suspension was



Confidential - For Attorneys Eyes Only                169

1   without pay?

2      A.    With pay.

3      Q.    Was with pay?  And was the, we'll

4   call it a piece of correspondence for

5   convenience, was the piece of correspondence

6   signed by her?

7      A.    That form that I received was signed

8   by her.

9      Q.    So it was like she was signing that

10  and giving it to you?

11     A.    And handing it to me, yes.

12     Q.    Regarding the issue of the notice of

13  your ability to have witnesses present at

14  your DELJIS hearing, about how much time do

15  you recall there being between the hearing

16  itself and receiving some sort of notice

17  that you might be able to have witnesses?

18     A.    A matter of days.

19     Q.    So like a week, less than a week?

20     A.    I believe less than a week.  Way

21  less than a week.

22     Q.    During the DELJIS hearing, you

23  mentioned that Detective or I guess Sergeant

24  ▇▇▇▇▇▇ at the time was somehow conferring



**W&F**
WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com
MAR APPENDIX 000093

Confidential - For Attorneys Eyes Only          170

1    with ▬▬▬▬▬▬ and ▬▬▬▬▬▬▬; was

2    that your testimony?

3        A.    Yes, he sat right next to them, and

4    I could see that he was talking to them.

5        Q.    Did you see ▬▬▬▬▬▬▬▬▬▬ have

6    any interaction with them at the hearing?

7        A.    I think it was in passing.  I don't

8    think during the actual testimony did he

9    have any interaction with them.

10       Q.    Did either of them testify, that you

11   can recall?

12       A.    Both ▬▬▬▬▬▬▬▬.  ▬▬▬▬

13   ▬▬▬▬ and ▬▬▬▬▬▬ testified.

14       Q.    Did they testify at all about their

15   allegations of domestic abuse or misconduct

16   from you towards them?

17       A.    It was a fiasco.  They testified and

18   stated whatever they wanted to say.

19       Q.    So of the people that testified, to

20   your recollection, who, if anyone, actually

21   testified about the DELJIS violations?

22       A.    ▬▬▬▬▬▬

23       Q.    Was he the only person who testified

24   about the DELJIS violations themselves?

**W&F**

WILCOX & FETZER LTD

Registered Professional Reporters

(302) 655-0477

www.wilfet.com

Confidential - For Attorneys Eyes Only                171

1      A.      He presented the case.   There was

2   other individuals.   I'm not familiar with

3   the names of everybody that was in that

4   board.   But I know that a Delaware state

5   trooper who was there in uniform by the name

6   of ██████████, who was supposed to be

7   representing the State Bureau of

8   Investigation, testified that he had

9   domestic problems with his wife and he

10   didn't run her name in DELJIS.   Well, while

11   that may be true, I'm sure he's run

12   individuals that, you know, weren't in the

13   course of business.

14      Q.      So to your recollection, it was

15   Sergeant Whitmarsh who offered information

16   about DELJIS violations?

17      A.      Correct.

18      Q.      At that point in time, during the

19   DELJIS hearing, had you ever had an occasion

20   at that point to speak with anyone about the

21   circumstances surrounding the allegations

22   that were made by ████████████?   And by

23   anyone, I mean anyone from the state

24   police, anyone from IA?

1    A.    No.

2    Q.    What about with ██████████?

3    A.    Regarding the DELJIS stuff, no.

4    Q.    You mentioned before the domestic

5  violence policy, and you've testified about

6  the inability to offer comments or conduct

7  an interview regarding the allegations from

8  Sarah and Karen.  Why is that problematic?

9  Is that problematic in your view, and if so,

10  why?

11    A.    With regards to ██████████, the

12  policy is clear.  You're supposed to

13  investigate the case, you're supposed to

14  speak and interview both participants.  That

15  is in the policy.  Everything that

16  Ms. Loiselle stated was taken at face value.

17  It wasn't looked into any further with

18  regards to her allegations of domestic

19  violence.

20          I'm going to say specifically

21  with regards to ██████████s, I

22  believe it was ██████████ who authored the

23  arrest warrant, his claim that on or about

24  September 19, 2013, that there was 11 phone

Confidential - For Attorneys Eyes Only                173

1   calls made to ████████████      4 voice

2   messages, and 22 text messages.   The problem

3   that I had with that is that it's clear, but

4   they presented no purpose or intent with

5   that.   Because there was multiple phone

6   calls that occurred between that date and

7   the 20th that was in the opposite direction,

8   from ████████████ to me.   There was also

9   multiple text messages that were in the

10  opposite direction from ████████████ to me

11  between that timeframe, before and after.

12  And that that particular incident was

13  written in the fashion that was prejudicial

14  to the warrant to bias the court.   I think

15  that they left out information that could

16  have at least permitted me or permitted a

17  judge to evaluate the appropriateness or the

18  elements of the alleged crimes.   That's with

19  regards to █████.   There was multiple other

20  instances.

21       Q.   At the time you received the warrant

22  that you're referring to, had you had any

23  occasion to be asked what was transpiring?

24       A.   No.   There's been no finding of

Confidential - For Attorneys Eyes Only

174

1   abuse in any way, shape, or form by me

2   involving ███████████.   And another

3   circumstance is that I was also advised to

4   file a counter PFA.   ███████████ filed

5   three PFAs that were ultimately dismissed

6   and a fourth that was dismissed by a family

7   court judge pursuant to Rule 41, which my

8   understanding is a very difficult ruling to

9   receive.

10   Q.   So moving on from the issue of the

11   actual DELJIS hearing, and I may have some

12   additional questions because I'm going to go

13   through these records in a moment.   But do

14   you recall the correspondence that you

15   received that was signed by ███████████

16   advising you that your employment with the

17   state police had ended?

18   A.   Do I recall that correspondence?

19   Q.   Yes.

20   A.   Yes.

21   Q.   Was there anything in that

22   correspondence that you can recall which

23   gave the impression that you were being

24   asked to tell your side or to have a

Confidential - For Attorneys Eyes Only                175

```
1    hearing?

2              MR. McTAGGART:   Object to form.

3              THE WITNESS:   Can I refer to

4    that letter again?  Because I believe

5    that --

6    BY MR. DELCOLLO:

7      Q.    It's in this pile so I can ask you

8    some questions about it.

9      A.    The way the letter was written I

10   don't think followed any format whatsoever.

11   I think the way it appeared was the colonel

12   was just saying, hey, if you want to come

13   talk about it, let us know.  But, you know,

14   what raises the suspicion is where that

15   sentence was in relation to the sentence

16   that preceded it.

17     Q.    Were you ever given a hearing by the

18   Delaware State Police, your employer, prior

19   to being terminated?

20     A.    No.

21     Q.    Did you request one?

22     A.    Yes.

23     Q.    Were you ever given any type of

24   trial board prior to your termination with
```



1   the Delaware State Police?

2       A.      A trial board through the division?

3       Q.      Yes.

4       A.      No, I was not.

5       Q.      And did you request one?

6       A.      Yes.

7       Q.      I'm going to ask you some questions

8    about the documents you were shown by

9    Mr. McTaggart.   Regarding Exhibit Number 1,

10   you were asked questions regarding the

11   bottom portion of these performance

12   appraisal scoring sheets.   Do you recall

13   that?

14      A.      Yes.

15      Q.      Do any of these -- and you can flip

16   through them.   Do any of those signed pages

17   indicate that you were certifying that you

18   had reviewed and seen directive number 4?

19      A.      None of them.

20      Q.      It just references directive

21   number 1?

22      A.      They do.

23      Q.      When you reviewed these at the time

24   that you signed them, these appraisal



Confidential - For Attorneys Eyes Only                          177

1   scoring sheets, had you, in fact, had the
2   opportunity to familiarize yourself with
3   DELJIS directive number 1?
4       A.    Ask me that again; I'm sorry.
5       Q.    During the time that you signed
6   these performance appraisal scoring sheets,
7   did you actually have the occasion, did you
8   actually, as you signed them, had you
9   actually reviewed DELJIS directive number 1?
10      A.    I had reviewed it, yes.
11      Q.    And had you reviewed the Delaware
12  State Police Acceptable Use Policy Rules and
13  Regulations related to Number 40,
14  Harassment, of the Delaware State Police
15  Anti-Harassment Policy?
16      A.    Yes, they were reviewed.
17      Q.    Was there any time after -- or I
18  should say was there any time on or about
19  3/28/13 that your employer ever brought a
20  document to you like this with directive
21  number 4 and said, here's directive number
22  4, we need you to sign this to acknowledge
23  that you reviewed it?
24      A.    That's never happened, and if it

Confidential - For Attorneys Eyes Only          178

1  did, it would be in conjunction with the way

2  the law is supposed to be.

3      Q.    And regarding the actual -- these

4  are your physical signatures on these

5  sheets, aren't they?

6      A.    They are.

7      Q.    All the way up to 2013, you've got

8  physical signatures on sheets, correct?

9      A.    Yes.

10     Q.    How often, aside from for

11 performance appraisal scoring sheets, did

12 you have to actually physically sign

13 regarding changes in policies and documents

14 relating to same?

15     A.    Not very often physically, no.  Not

16 very often.

17     Q.    Regarding Exhibit Number 3 for a

18 moment, what is this screen actually as you

19 understand it?  What is it?

20     A.    I think that is a popup screen and a

21 portion of the login.

22     Q.    And when you say a popup screen and

23 a portion of the login, is that the screen

24 that would pop up when you would log into

1    Q.    So --

2    A.    May I point something else out?

3    Q.    Go ahead.

4    A.    Even with policy number 1, by all

5    means, for purposes of what's going on, I'm

6    not following the policy.  This is the same.

7    This is the verification of acknowledgment

8    that DELJIS has provided.  We're not doing

9    that.

10    Q.    So there's a document that you're

11    referring to on the very back of Exhibit

12    Number 2 that says, "Verification of

13    acknowledgment."  Is that fair to say?

14    A.    Yes.

15    Q.    And this document regarding

16    verification of acknowledgment, it has

17    places.  Printed full name.  So printed full

18    name, other names used, driver's license

19    number and state agency, county of

20    employment, date of birth, sex, race.  And

21    then further down on this document, which is

22    again, the last page of Exhibit Number 2, it

23    says, "This is to verify that I have read

24    and understand DELJIS policy number 4."

Confidential - For Attorneys Eyes Only                192

1   Then there's a line that says employee's

2   signature.  Then there's a verifying person,

3   which is agency head or designee signature.

4              So this document as described

5   and as it appears here, have you ever seen

6   that document before?

7       A.     Not for policy 4.

8       Q.     And do you have any recollection of

9   any agency head or designee sitting down

10  with you with this verification form and

11  getting you to sign it?

12      A.     No.

13      Q.     To your recollection, did anyone at

14  the DELJIS Board of Managers present a

15  signed verification form as evidence that

16  you were aware of and understood policy

17  number 4?

18      A.     No.

19      Q.     Did anyone ever ask you whether you

20  had had the occasion to sign this during the

21  course of the DELJIS investigation that was

22  conducted by ███████████████?

23      A.     No one ever brought it to my

24  attention, acknowledged it.  The discovery

Confidential - For Attorneys Eyes Only           193

1   records that I saw was a blank copy just

2   like that.

3       Q.      Did anyone ever ask you, setting

4   aside whether you actually signed the

5   agency's actual verification form, did

6   anyone ever ask you whether or not you had

7   actually had the occasion to review it

8   separate from signing the formal

9   verification form?

10      A.      No.

11      Q.      Regarding ███████████████, who as I

12  understand it conducted a parallel

13  investigation as it was described into

14  charges for stalking and harassment, did he

15  ever reach out to you, interview you, ask

16  you any questions about information related

17  to execution of policy number 4?

18      A.      No.

19      Q.      So as I move along here, I'm going

20  to see if any of these raised some

21  questions.  Regarding count 18 for the plea

22  agreement that we went through, I think

23  that, and if memory serves correctly, count

24  number 18 from the grand jury charges, I



Confidential - For Attorneys Eyes Only          198

1   equipment listed on the enclosed page, your

2   separation pay, including any accrued

3   balances, will be issued on March 20, 2015.

4   Subsequent written correspondence from the

5   human resource office will provide you with

6   your options regarding your pension

7   contributions.  You may schedule a meeting

8   with the superintendent or his designee to

9   discuss this matter by notifying the

10  director of human resources in writing

11  within five calendar days of this letter."

12  So that's the bottom paragraph.  Then the

13  last sentence indicates an opportunity, if

14  you want to, to meet with the superintendent

15  or his designee to discuss the matter.  Is

16  that fair?

17      A.    Yes.

18      Q.    Moving up to the paragraph, it says,

19  "This letter will serve as the division's

20  official notice that your employment as a

21  trooper is terminated immediately due to

22  your inability to maintain access to the

23  Delaware Criminal Justice Information

24  System, DELJIS, databases, a necessary and



Confidential - For Attorneys Eyes Only                    199

1   mandatory requirement of the position of

2   state trooper or any other police officer

3   position in the State of Delaware."

4                    So this letter conveyed to you

5   that your employment was over; is that fair

6   to say?

7       A.      That is what I took from the letter.

8       Q.      In fact, the letter says your

9   employment was terminated immediately?

10      A.      Correct.

11      Q.      What did you understand that to

12  mean?

13      A.      Right then and there.

14      Q.      So did you understand that a

15  decision had already been made to terminate

16  your employment?

17      A.      Yes.

18      Q.      As of this letter being issued, you

19  were terminated?

20      A.      Yes.

21      Q.      Did you understand anything in this

22  letter to be offering you an opportunity to

23  make your case that you should not be

24  terminated?



Confidential - For Attorneys Eyes Only                    200

1      A.      There's nothing in there that would

2  lead me to believe that at all.  Period.

3      Q.      I note that in that first sentence,

4  it says DELJIS is a necessary mandated

5  requirement for the position of state

6  trooper or any other police officer position

7  in the State of Delaware.  Are there any

8  other types of trooper, sworn personnel,

9  actual law enforcement positions within the

10  Delaware State Police that to your knowledge

11  don't require access to DELJIS?

12      A.      Yes.

13      Q.      What are they?

14      A.      To the best of my knowledge, the

15  helicopter pilot, the trooper medic.  There

16  has been multiple exceptions made for other

17  positions within the Delaware State Police

18  that didn't require that.  I know that court

19  liaison, which ███████████████ advised he

20  was a court liaison, was another position.

21  I know that there are school resource

22  officers that could provide security at the

23  schools around the clock, especially that

24  the problems were going on, that potentially

**W&F**
WILCOX & FETZER LTD
MARTIN v. APPENDIX 000108
Registered Professional Reporters
(302) 655-0477
www.wilfat.com

Confidential - For Attorneys Eyes Only                    201

1   wouldn't need access to DELJIS.

2              There are civilian jobs on the

3   state police that potentially wouldn't

4   require DELJIS, which would be the

5   mechanics, the purchasing individuals,

6   security jobs at the Division of Motor

7   Vehicles where uniformed troopers aren't

8   accessing DELJIS, they're there to provide

9   security.  I know that there have been

10  exceptions made for various reasons

11  historically throughout the course of time

12  throughout the time with the Delaware State

13  Police that they have made exceptions to

14  people.  I can give an example.

15      Q.    Go ahead.

16      A.    ███████████████████ went to

17  court, some sort of hearing.  She lied.  She

18  was found guilty of lying.  She was

19  permitted to continue to arrest individuals,

20  write tickets, do patrol work.  However, if

21  somebody said that they were going to go to

22  court with whatever she charged them with,

23  the state was required to provide ██████

24  material to the defense that she has been



**W&F**
WILCOX & FETZER LTD.
McGINN, APPENDIX 00B109
Registered Professional Reporters
(302) 655-0477
www.wilfet.com