IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANDREL MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-564 (MN) |
| | ) | |
| THE STATE OF DELAWARE | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY/DIVISION OF THE STATE | ) | |
| POLICE; ALICE BAILEY, in her Individual | ) | |
| and official capacities; and NATHANIEL | ) | |
| McQUEEN, JR., in his individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

G. Kevin Fasic, Katherine Randolph Witherspoon, Anthony N. Delcollo, OFFIT KURMAN, Wilmington, DE – attorneys for Plaintiff

Michael F. McTaggart, Adria Martinelli, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE – attorneys for Defendants

March 15, 2019
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**:

On June 30, 2016, Plaintiff Andrel Martinez ("Plaintiff" or "Martinez") filed this action alleging Title VII discrimination and due process claims against the State of Delaware Department of Homeland Security/Division of the State Police ("DSP") and the Delaware State Troopers Association ("DSTA"). (D.I. 1). On July 28, 2016, Defendant DSTA moved to dismiss all claims. (D.I. 8, 14). On August 4, 2016, DSP also moved to dismiss. (D.I. 12, 13). On November 23, 2016, the Court issued an opinion and order dismissing the claims against DSTA and granting-in-part and denying-in-part DSP's motion. (D.I. 19, D.I. 20). Thereafter, on December 20, 2016, Martinez filed an Amended Complaint (D.I. 24) asserting a Title VII claim[1] against DSP, and § 1983 claims against Alice Bailey ("Bailey") and Nathaniel McQueen ("McQueen"), in their individual and official capacities (collectively DSP, Bailey, and McQueen are referred to as "Defendants"). Discovery ended May 2, 2018. (D.I. 49). On June 1, 2018, Defendants moved for summary judgment on all claims. (D.I. 82, 83, 84). Plaintiff opposed.[2] (D.I. 90, 91). For the reasons stated below, the Court will grant Defendants' motion.

---

[1]    In Count I, Martinez also alleges discrimination under 19 Del. C. § 711. A plaintiff, however, may not seek relief under both Title VII and the Delaware state discrimination statute. *See Esaka v. Nanticoke Health Servs., Inc.*, 752 F. Supp.2d 476, 481 (D. Del. 2010). Plaintiff does not address (or even mention) his state law discrimination claims in his papers, and the Court understands that he intends to proceed only on his Title VII claim.

[2]    In his response to Defendants' motion, Plaintiff acknowledges that he has no evidence of Bailey's involvement in the adverse employment decisions against him, and he states that he does not oppose the dismissal of claims against Defendant Bailey. (D.I. 90 at 1-10). The Court, thus, will grant Defendants' motion as to Bailey as unopposed.

# I.    BACKGROUND

Martinez is a former DSP Trooper.  While employed by DSP, Martinez used – and was trained in using – DELJIS,[3] a computer system that contains criminal history information and motor vehicle information, accessible to law enforcement and certain authorized governmental employees.  (*E.g.*, D.I. 84 at DSPA-181).  Use of DELJIS is limited to authorized users for a specific business reason.  Martinez acknowledged multiple times that he understood the limitations on the use of DELJIS.  (*Id.* at DSPA-204-206, 229, 305-313).  For example, he stated in writing that he had read and understood and agreed to abide by DELJIS Directive 1 entitled "Restrictions Regarding Dissemination and Use of Criminal History Information.  (*See id.* at DSPA-305-313).  Directive 1 is a summary "intended to answer many of the questions regarding criminal history," but notes that the conduct of "a criminal justice employee is governed by" Chapters 85 and 86 of Title 11 of the Delaware Code.  (*Id.* at DSPA-176; *see also id.* at DSPA-175-179).  Directive 1 provides in pertinent part that "[m]otor vehicle information may be used by any . . . law enforcement agency . . . in carrying out its functions."  (*Id.* at DSPA-179; *see also id.* at DSPA-176-185).[4]

Martinez attended at least one DELJIS training session at which improper access to DELJIS was addressed.  (D.I. 84 at DSPA-204-206, 229, 239).  Among examples of "Security Issues" provided at that session was "[e]mployees accessing data on their spouse, boyfriend/girlfriend, other family members, or who their daughter/son is dating."  (*Id.* at DSPA-239).  DELJIS Directive 4 identifies an "improper breach" as an access by an authorized user into

---

[3]    DELJIS stands for Delaware Criminal Justice Information Center System.  DELJIS is not a part of the DSP or the Department of Homeland Security.  (D.I. 84 at DSPA-350).  The system is run by a Board of Managers.  (*Id.*).

[4]    Plaintiff signed at least seven other similar acknowledgements in conjunction with his annual performance reviews from 2008-2013.  (D.I. 84 at DSPA-306-313).

the system "without a specific business reasons directly related to the user's authorized access." (*Id.* at DSPA 209; *see also id.* at DSPA 209-221). After DELJIS Directive 4 issued on March 28, 2013, Plaintiff acknowledged that he had read that directive. (*Id.* at DSPA 204-206, 227).

Notwithstanding the above, Martinez used DELJIS to access information about his former girlfriend and others. This came to light on January 15, 2014, when Sergeant Jeff Whitmarsh ("Whitmarsh") received a call from Captain Griffin, the head of Internal Affairs, regarding a complaint from a Courtney Lewis ("Lewis"), a friend of Sarah Loiselle ("Loiselle"), Martinez's former girlfriend and the mother of Martinez's child. (D.I. 84 at DSPA 338).[5] Whitmarsh obtained a DELJIS printout and confirmed that Martinez had accessed information about Lewis and her family. (*Id.* at DSPA 338; *see also id.* at DSPA 44-45).[6] Whitmarsh also found a large number of DELJIS queries that Martinez had conducted near the property where Loiselle lived. (*Id.* at DSPA 339). The list of persons queried for no lawful purpose contained at least twenty-eight individuals, including Loiselle and her friends, as well as Martinez's brother and Martinez's new girlfriend. (*Id.* at DSPA 147-49). Whitmarsh determined that the queries were in violation of DELJIS policy. (*Id.* at DSPA 337-340).

On March 14, 2014, Martinez was arrested for Felony Stalking, Harassment, and sixty charges of "Provid[ing] Criminal History Record Information to Another Person or Agency Not

---

[5] Two days later, Martinez was placed on administrative leave with pay, as a result of an emergency PFA issued against him by Family Court. (D.I. 84 at DSPA-316, *see also id.* at 250-51).

[6] During the course of the investigation, Loiselle made allegations of domestic abuse. (D.I. 84 at DSPA-338). DSP assigned Sgt. David Weaver ("Weaver") to conduct a domestic violence investigation into Loiselle's allegations. (*Id.*).

Authorized."[7] (D.I. 84 at DSPA 1-22). On the same day, Martinez was given "Notice of Internal Inquiry" informing him that the "Internal Affairs Office [was] conducting an investigation into an allegation of violation of Rules and Regulations #1 Compliance with Laws, Rules, Regulations, Orders (4 counts)."[8] (*Id.* at DSPA 166). On March 18, 2014, Plaintiff was "suspended without pay and benefits with intent to dismiss" because of his arrest for "Stalking (felony)." (*Id.* at DSPA 171-72). He was advised of his right to request a hearing in writing within five days. (*Id.*). On March 21, 2014, Plaintiff's attorney James E. Liguori ("Ligouri") "request[ed] an Internal Affairs hearing and procedures afforded pursuant to LEOBOR." (*Id.* at DSPA 168). On April 10, 2014, counsel for the DSP advised Liguori that the internal affairs investigation was not complete and had been suspended pending the outcome of the criminal case. (*Id.* at DSPA 169-70). Specifically, DSP's counsel stated that:

> Due process requires that the State Police provide [Martinez] with a prompt, post-deprivation hearing (independent of a LEOBOR hearing). If Martinez would like such a hearing, please let me know immediately so that we can begin the scheduling process. I understand if you would not want to have such a hearing at this time because it would present your client with the difficult choice between invoking his Fifth Amendment right against self-incrimination, or testifying under oath on matters which might be used against him in the criminal case.
>
> In any event, I need to know in writing whether Martinez wants a post-deprivation hearing to be scheduled in the next thirty days, or whether he waives any claim that he did not receive a prompt post-deprivation hearing.

(*Id.*). In response, Ligouri waived the hearing pending the outcome of the criminal case. (*Id.* at DSPA-354-355).

---

[7]     The Attorney General's Office, not the DSP, makes charging decisions in DELJIS cases involving troopers. (D.I. 84 at DSPA-349). Thus, the charges against Martinez were determined by the Attorney General's office, not the DSP. (*Id.* at DSPA-345; *see also id.* DSPA-61).

[8]     The notice specified that the counts included 1 count – Rules and Regulations #1A, violation of the Policy # 4 DELJIS Policies and Procedures and 3 counts – Rules and Regulations #1A, violation of Delaware Law . . . ." (D.I. 84 DSPA-166).

On September 16, 2014, Martinez entered a plea agreement in Superior Court to two counts of Unlawful Use of Criminal History and Record Information. (D.I. 84 at DSPA 141; *see also id.* at DSPA 344). He was sentenced to probation. (*Id.* at DSPA 141). The statute to which he pleaded guilty provides:

> Any person who knowingly provides criminal history record information to a person or agency not authorized by this subchapter to receive such information or who knowingly and wrongfully obtains or uses such information shall be guilty of a class A misdemeanor and shall be punished according to Chapter 42 of this title.

11 Del. C. § 8523(d). The statute further provides that "[c]onviction of a violation of this section shall be *prima facie* grounds for removal from employment by the State or any political subdivision thereof, in addition to any fine or other sentence imposed." *Id.* § 8523(e).

After the criminal case ended, neither Martinez nor his attorney requested an internal affairs hearing, and instead indicated that Martinez wanted to wait until the DELJIS hearing was concluded. (D.I. 84 at DSPA 355-56). On October 2, 2014, McQueen, the Superintendent of the DSP, notified Plaintiff in writing that he remained suspended without pay and benefits with intent to dismiss because he had been convicted of two "serious criminal charges" that violate the Divisional Rules and Regulations. (*Id.* at DSPA 173). The letter noted that Martinez remained "suspended from access to DELJIS with a pending hearing on November 20, 2014, which does not allow you to perform the duties of a trooper." (*Id.*). The letter concluded that "[t]he Division will respectfully postpone any Divisional charges until the resolution of the DELJIS hearing in the interest of not having the Divisional charges heard now and then the potential for a second hearing relate to further Divisional charges resulting from the outcome of the DELJIS hearing." (*Id.*).

On February 19, 2015, Plaintiff appeared *pro se* before the DELJIS Board for a hearing, seeking reinstatement of his DELJIS access, which had been suspended since January 2014. (D.I. 84 at DSPA 104-135). At the hearing, Plaintiff testified that he was not familiar with the

DELJIS rules and requirements for use of the system. (*Id.* at DSPA 126). He also testified that he was unsure of the DELJIS policy at the time that he queried the names and that he was not familiar with the DSP Manual. (*Id.* at DSPA 126, 130) . He testified that some of his accesses into the system were done "under a moral basis," not business-related purposes. (*Id.* at DSPA 128). He could not, however, explain why he queried a number of the names on the DELJIS printouts, including an attorney for the DSP, a DFS worker and a police officer. (*Id.* at DSPA 129, 131). Immediately following the hearing, the DELJIS Board unanimously voted to permanently suspend Martinez's DELJIS access.[9] (*Id.* at DSPA 157). The decision was also reduced to writing and delivered to Martinez on July 27, 2015. (*Id.* at DSPA 150-52).

On February 25, 2015, McQueen wrote to Martinez providing "official notice that [his] employment as a Trooper is terminated immediately due to [his] inability to maintain access to [DELJIS] databases, a necessary and mandated requirement for the position of State Trooper or any other police officer position in the state of Delaware." (D.I. 84 at DSPA 174). Martinez was told that he could schedule a meeting with McQueen or his designee to discuss his termination by notifying the Director of Human Resources in writing within five calendar days. (*Id.* at DSPA 330). He did not do so.

On November 30, 2015, Martinez appeared before a three-member panel of the Council on Police Training ("COPT"). (D.I. 84 at DSPA 161-65). The parties "provided commentary on . . . documents and presented legal argument" but "[n]o evidentiary witnesses were called." (*Id.* at DSPA 162). At the conclusion of the hearing, the panel determined that "the record makes clear that Mr. Martinez accessed personal criminal history information for other than official purposes"

---

[9]     This was apparently the first time that a member of the DSP had his or her DELJIS access permanently revoked. (D.I. 84 at DSPA-348).

and that such access was "an absolute violation of the public trust." (*Id.* at DSPA-164). Having determined that Martinez's misconduct (evidenced by his guilty plea to two counts of Unlawful Use of Criminal History Record Information) "so violated the public trust that he does not deserve to be a police officer in Delaware," the panel found that "revocation of [his] certification is appropriate," and decertified Martinez as a police officer in the State of Delaware. (*Id.* at DSPA-164-65).

On June 25, 2015, Martinez filed a Charge of Discrimination with the EEOC, alleging that he had been discriminated against on the basis of race, gender, national origin, retaliation and marital status. (D.I. 84 at DSPA-314). The Charge of Discrimination was based on Martinez's February 25, 2015 discharge. (*Id.*). It did not allege a hostile work environment or continuing action. After investigating, on February 10, 2016, the EEOC "found that there is no reasonable cause to believe that an unlawful employment practice has occurred" and issued a "no-cause determination and dismissal" and a Right to Sue Notice. (*Id.* at DSPA-315).

Martinez then filed this lawsuit, in which he claims, *inter alia*, that he was treated more harshly than other current or former members of the DSP (*i.e.*, comparators) because of race (Hispanic) or gender. (D.I. 24 ¶ 17). His evidence regarding the alleged comparators and their offenses includes the following (as set forth in D.I. 83 at 7-8; *see also* D.I. 24 ¶ 17)[10]:

> Employee #1 - white male,-investigated by DSP in 2006 for disseminating information to girlfriend and running fourteen other names as part of domestic dispute. (DSPA-359; DSPA-361) He was prosecuted by the Attorney General's Office and took a Probation Before Judgment to charges involving unlawful use of a computer. (DSPA-359) He was given an IA Trial Board and suspended for 40 hours. (DSPA-360). DELJIS held a hearing and ordered that he receive additional training. (DSPA-360). *See McDerby v. Daniels*, (C.A. No. 08-882 (GMS), 2010 WL 2403033 (D. Del. June 16, 2010).

---

[10]    References to DSPA-### in the quoted paragraphs are to documents submitted in Defendants' Appendix (D.I. 84) accompanying its opening summary judgment brief.

Employee #2 - white female, investigated by DELJIS in 2011 when a friend ran names on her computer on one day without her knowledge. (DSPA-373). She was not prosecuted criminally. (DSPA-374) She had a DELJIS hearing and suspended from the DELJIS system for three months, (DSPA-374) and agreed to an IA suspension of eight hours. (DSPA-375).

Employee #3 - white male-former Corporal, investigated by DSP in 2015 when he ran his ex-girlfriend's name in DELJIS four times and her boyfriend three times. (DSPA-369-70) Prosecuted by the Attorney General's Office and pled guilty to Official Misconduct by Probation Before Judgment. (DSPA-371). He immediately retired and there was no IA hearing. DELJIS held a hearing in his absence and suspended him for two years. (DSPA-371). He also lost his COPT certification. (DSPA-371).

Employee #4 - white male-former Corporal, investigated by DSP in 2015 for running one car tag. (DSPA-377) The Attorney General's Office declined to prosecute. (DSPA-377) DELJIS ordered him to attend an eight-hour training course. IA suspended him for two days. (DSPA-377).

Employee #5 - white female-civilian call center operator, investigated by DSP in 2013 for running DELJIS information on a niece and her boyfriend, a total of 40 times. (DSPA-364; DSPA-367). Her penalty from the DSP was to forfeit a period of vacation. (DSPA-366) DELJIS suspended her privileges for some time and she was eventually reinstated but had to go back for training, be on probation, and keep a log of her queries. (DSPA-365). The Attorney General's Office declined to prosecute, based in part on the fact that much of the information accessed was public information that could be viewed in the DELJIS warrant public website. (DSPA-363; DSPA-342).

In support of his discrimination claims, Martinez also asserts race-based comments made

by various police officers. In his opposition, he generally asserts (D.I. 90 at 2):

During the entirety of his employment and throughout the course of his investigation and arrest, Mr. Martinez was subjected to numerous racially discriminatory remarks and behaviors. [D.I. 91] Martinez 117-119. This behavior, corroborated by Martinez's former colleague Justin Galloway (who worked at the same troop as Martinez for a time), included numerous references to Hispanic individuals as "wetbacks" or "amigos" with requests that Mr. Martinez offer translations, placing printouts of Martinez on workplace walls with racially disparaging defacements, and placing Tacobell coupons in Mr. Martinez's mailbox. [D.I. 91] Galloway 17-20, 25. Mr. Martinez offered testimony that he was asked whether he needed his arrest warrant in Spanish and was chastised by an investigating officer that he should "know better" because he had not been dating a Hispanic woman. [D.I. 91] Martinez 118. Mr. Martinez also testified that an officer directly involved in the investigation against him, Lt. Whitmarsh, made racially derogatory remark in the course of asking Mr. Martinez to translate for some

Spanish speaking individuals that had come to the troop building. [D.I. 91] Martinez 117.

In his Amended Complaint, Martinez alleges a number of derogatory remarks and actions from unnamed sources (*e.g.*, D.I. 24 ¶¶ 21, 22, 25, 27, 28, 29, 31, 32, 33) and several specific remarks by named individuals, including (*id.* ¶ 18; *see also* D.I. 83 at 14)[11]:

> • Whitmarsh (1999) - derogatory comments while in training at the academy, including that Plaintiff "would be easily promotable because of [his] background" or because he was "Hispanic and bilingual." (D.I. 84 at DSPA-322A; D.I. 24 ¶ 20).

> • Supervisor Darren Short (2003) - comments about Plaintiff's racial background, referring to Plaintiff being on a "taco circuit" at the time he was beginning to prepare for promotion. (D.I. 24 ¶ 24; D.I. 84 at DSPA-322B).

> • Det. Dan Wright (2004-05) - printed a photo of Plaintiff and hung it up on a wall "indicating that Plaintiff was slower at running than the others were during a marathon; large curly mustache was drawn on Plaintiff's picture." (D.I. 24 ¶ 23).

> • Whitmarsh (2011) - told Plaintiff "I need you to talk to your wetback buddies, to see what they want." (D.I. 24 ¶ 26).

> • Weaver (2014) – "Plaintiff attempted to speak with Weaver about the matter, and he cut Plaintiff off and stated 'you ought to know better; this isn't a Hispanic woman you dated, she won't put up with you.'" (D.I. 24 ¶ 30).

## II.   LEGAL STANDARDS

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a *genuine issue* for trial.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). The

---

[11]   In the papers supporting their motion, Defendants offer approximate dates for certain of the allegations made. Plaintiff did not dispute those dates in his opposition.

Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). The Court may not grant summary judgment if a "reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 459 (3d Cir. 1989).

To defeat a motion for summary judgment, however, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. United States Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). "[The] mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 (3d Cir. 1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### A. Title VII Claims

Martinez alleges that he was discriminated against on the basis of race and gender when he was suspended and ultimately terminated as a Delaware State Police Officer.[12] Title VII prohibits an employer from engaging in race or gender discrimination against an employee. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000). Pursuant to the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Plaintiff alleging a violation under Title VII must first establish a *prima facie* case of discrimination. To do so he must offer sufficient evidence that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) similarly situated persons who were not members of his protected class were treated more favorably or there are other "circumstances that could give rise to an inference of intentional discrimination." *Drummond v. Amazon.com LLC*, No. 18-293 (RGA), 2018 WL 5629811, at *5 (D. Del. Oct. 31, 2018) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Once a *prima facie* case has been established, "the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision." *Goosby*, 228 F. 3d at 319. If the employer can offer a legitimate, nondiscriminatory reason for its actions, the plaintiff must then "demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *Id.*; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) ("Once the employer answers its relatively light burden

---

[12]    Martinez identifies two additional "negative employment action[s]" taken against him: his suspension with pay and that he was "given no notice of criminal or administrative investigations until his arrest on March 13, 2014." (D.I. 24 ¶ 38). These are not hiring, firing, or "compensation, terms, conditions, or privileges of employment" under Section 703(a) of Title VII. To the contrary, the Third Circuit has held that a paid suspension is not an adverse employment action under the substantive provision of Title VII. *See Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision.").

by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion).").

    1.  Plaintiff's Asserted *Prima Facie* Case.

  The parties do not dispute that Martinez is a Hispanic male[13] and that an adverse action was taken against him when he was suspended without pay and later terminated from his position as a Corporal with the DSP. Defendants assert, however, that Martinez's claim fails at step two of the analysis[14] because (1) he was no longer qualified for his prior position as a result of the permanent removal of his DELJIS access by the DELJIS Board and (2) the Council on Police Training later voted to decertify Martinez as a police officer in the State of Delaware. (*See* D.I. 83 at 10; D.I. 95 at 3). In response, Plaintiff asserts that deposition testimony suggested that "there are some trooper jobs that do not require access to DELJIS or require access to DELJIS so infrequently that they could conceivably be carried out without DELJIS access." (D.I. 90 at 3). He identifies positions, such as Trooper Medic, Trooper Court Liaison and mechanic that either involved "infrequent" or no use of DELJIS.[15] (*Id.* at 3). In doing so, however, Plaintiff does not

---

[13] As noted above, Martinez has alleged that he was discriminated on the basis of his gender. In his response to Defendants' motion, he makes no arguments and offers no evidence to suggest that his treatment was based on the fact that he was a male.

[14] Defendants also dispute that Martinez's *prima facie* case fails at step four of the analysis because he cannot establish that the circumstances of his termination give rise to an inference of race discrimination. Defendants addressed that issue in connection with the discussion of whether DSP's proffered reason for termination is a pretext, and the Court will do so as well.

[15] At his deposition, Martinez also mentioned the positions of "helicopter pilot," "school resource officers . . . that potentially wouldn't need access to DELJIS" and civilian jobs such as security at the DMV. (D.I. 91, Weaver Dep. at 200-01). There is no evidence provided to the Court as to whether Martinez meets the requirements of any of the positions that he contends did not require DELJIS access.

dispute that he could **not** have returned to **his former trooper position**, which by his own account involved "running tags consistently." (D.I. 84 at 323). Instead, Martinez suggests that the DSP should have accommodated him with a different position – one that did not require DELJIS access. (D.I. 90 at 3-4, 8). Martinez cites to no authority to support this suggestion, and the Court is unaware of any. Indeed, to the contrary, case law discussing establishment of a *prima facie* case states that Plaintiff must show that he is qualified for his "former position" or the "position in question." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016); *Mowafy v. Noramco of Delaware, Inc.*, 620 F. Supp. 2d 603, 614 (D. Del. 2009) (citing *Aljadir v. Substitute Teacher Serv.*, No. 02-464 (GMS), 2004 WL 2223073, at *1 (D. Del. Oct. 5, 2004)). Plaintiff has failed to show that, given his permanent removal from DELJIS access, he was qualified for his prior position, and has failed to make out a *prima facie* case of discrimination.

2. DSP's Proffered Legitimate Non-Discriminatory Reason for Plaintiff's Termination and Plaintiff's Assertion that the Proffered Reason Is Pretextual.

Even if this Court were to conclude that Martinez had established a *prima facie* case of discrimination, Defendants have articulated a legitimate non-discriminatory reason for his suspension and eventual termination: the fact that Martinez's DELJIS access was permanently revoked and he was therefore unqualified to hold his position as a police officer. Thus, Martinez must "demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *Goosby*, 228 F. 3d at 319. If he cannot carry this burden, DSP is entitled to summary judgment on the Title VII claim. *See Shahin v. Delaware*, No. 07-644 (GMS), 2010 WL 4975653, at *4 (D. Del. Dec. 2, 2010).

"[To] defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations omitted); *see also Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006). To accomplish this, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ." *Fuentes*, 32 F.3d at 765. Instead, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Id.* (internal quotation marks omitted).

Here, there is no dispute that DSP's stated reason for termination – permanent loss of access to DELJIS – was consistent and documented in contemporaneous correspondence with Martinez. (D.I. 84 at DSPA-171, 174). There is also no dispute that Martinez pleaded guilty to two counts of Unlawful Use of Criminal History and Record Information, conviction for which "shall be *prima facie* grounds for removal from employment by the State . . . ." 11 Del. C. § 8523(e). Moreover, there is no dispute that Martinez's DELJIS access was permanently revoked by the DELJIS Board – not DSP – after a hearing. (D.I. 84 at DSPA-104-135, 150-52). Nor is there any dispute that access to DELJIS is critical for the position Martinez held – as Martinez himself testified that his training was "to run anybody and everybody in DELJIS." (*Id.* at DSPA-320). He further testified that doing one's job and being "the best police officer" one can be means "running tags consistently . . . looking for bad guys." (*Id.* at DSPA-323).

Nevertheless, Martinez claims that the real reason for his termination was because of his race. In support, he argues that (1) white males (and females) were allegedly treated more favorably under similar circumstances, and (2) derogatory, race-based comments have been made

by police officers dating all the way back to his training in 1999. The Court will address each argument in turn.

### a. More Favorable Treatment of Others

A plaintiff may support an inference of discrimination with "comparator evidence" among other things. *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 (3d Cir. 2010). When relying on comparator evidence, a plaintiff has the burden of proving that so-called comparables are "similarly situated in all relevant aspects." *See Danao v. ABM Janitorial Serv.*, 142 F. Supp. 3d 363, 374 (E.D. Pa. 2015); *see also McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (comparators must be "similarly situated") (citing *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003) ("examples of disparate treatment 'need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances'") and *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994) (stating in order to show that an employee is "similarly situated," all of the relevant aspect of employment need to be nearly identical)). "Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated." *McCullers*, 427 F. App'x at 195. Relevant factors may "include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (citation omitted)).

The sum total of Plaintiff's discussion of comparator evidence in his opposition to the motion for summary judgment is:

> Multiple individuals, white males and females, in the course of their depositions were demonstrated to have engaged not merely in improper access, but improper dissemination, and were nevertheless permitted to maintain their employment with the State Police or remove themselves from employment in a manner that was less

15

injurious to their reputations. [D.I. 84 at DSPA 358-377]. These individuals were given an opportunity to either continue their employment with the state police or continue their lives without the black mark of "dismissal" on their records. These individuals were also all afforded some manner of process directly from the DSP. *See generally* D.I. 81, pp. 7-8. Mr. Martinez was afforded no such opportunity. [D.I. 91 at Martinez Dep. 178].

(D.I. 90 at 3).

Next, DSP contends that Martinez has failed to present valid comparators that are "similarly situated in all relevant aspect." . . . Given the fact that DELJIS access is not a necessary requisite for performing certain trooper jobs, Mr. Martinez's lack of DELJIS access is not a material difference between him and the other comparators. At least one of the comparators, [Employee #4], actually engaged in activity more severe than the improper access charges leveled against Mr. Martinez because they admitted to disseminating DELJIS information to third parties. [D.I. 81, p. 8]. As all comparators were guilty of DELJIS violations and afforded proper process in assessing discipline, the facts here are enough to establish that the comparators were similarly situated with respect to performance, position, and conduct.

(*Id.* at 9).

Significantly, none of the purported comparators had their DELJIS access permanently revoked by the DELJIS Board. Although Plaintiff argues that that is not "material," the Court disagrees. As discussed above, there is no dispute that Plaintiff could not perform his prior job – the one from which he was terminated – without access to DELJIS. Thus, he is unlike the others in his list of comparators in that his permanent loss of DELJIS access prevented him from ever performing the job he had held previously.[16]

Finally, Plaintiff asserts that he was discriminated against with respect to his race in connection with being offered a hearing. In support, he generally claims "[t]hese [comparator] individuals were also all afforded some manner of process directly from the DSP." (D.I. 90 at 3

---

[16] The Court notes that there are other significant differences between Plaintiff and the purported comparators as well. For example, none of the others pleaded guilty to "Unlawful Use of Criminal History and Record Information." And none of the others engaged in the misuse of DELJIS on a scale nearly as large as that of Plaintiff.

(citing D.I. 81 at 7-8); *see also* D.I. 90 at 8 ("Mr. Martinez was not offered a hearing, while other white officers were all offered process in connection with the final discipline imposed."). What process was purportedly given to each – or how that evidences an inference of racial discrimination – is never addressed by Martinez. Moreover, in looking at the record, comparator Employee #2 testified that she agreed to a suspension and had no hearing. (D.I. 84 at DSPA-375). Employee #3 had no IA hearing and, like Martinez, lost his COPT certification. (*Id.* at DSPA-371). Employee #4 was suspended for twenty-four hours without pay, but there is no indication as to whether he had or was offered any IA hearing. (*Id.* at DSPA-377). Similarly, Employee #5 testified that she had no IA hearing prior to losing her vacation. (*Id.* at DSPA-366).

No reasonable factfinder could conclude based on this record that Plaintiff's race was the basis for his suspension without pay and later termination, or that his race was the basis for any lack of a hearing offered to Plaintiff.

b.      Discriminatory Remarks

A plaintiff may support an inference of discrimination with respect to termination with "statements or actions by [his] supervisors suggesting racial animus." *Golod*, 403 F. App'x at 703 n.2 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)). In determining the probative value of purportedly discriminatory remarks, courts "evaluate factors pertaining to the declarant's involvement in recognizing a formal or informal managerial attitude, including the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action." *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997). "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes*, 32

F.3d at 767 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)).

Here, Plaintiff refers to statements of various police officers over the course of his employment to support an inference that the reason for his termination was discriminatory.[17] Many of the remarks date back more than ten years before his termination. *See, e.g.*, *Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213, 217-18 (3d Cir. 2013) (finding that veiled racial slurs made a year prior to plaintiff's termination would not permit a reasonable factfinder to conclude the termination constituted racial discrimination); *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997) (comments that occurred four or five months prior to the termination decision were insufficient to show discrimination). Additionally, the decisionmaker for Plaintiff's suspension and eventual termination was Defendant Colonel McQueen, a black male, whom Plaintiff has not alleged to have made any of the race-based comments or conduct. None of the asserted comments relate directly to McQueen's decision to terminate Martinez. Indeed, none of them refer to the question of whether Martinez should be suspended or terminated. *See Keller*, 130 F.3d at 1112.

No reasonable factfinder could conclude based on the record before the Court that the asserted comments cast doubt on Defendants' articulated nondiscriminatory reason for Plaintiff's termination. Thus, Martinez cannot demonstrate that Defendants' asserted legitimate reasons for his termination are pretextual, and DSP is entitled to summary judgment on the Title VII claim.

---

[17] Plaintiff has not alleged a hostile work environment (nor has he administratively exhausted such a claim). (D.I. 84 at DSPA-314).

### B.    Due Process Claims

Martinez alleges that Defendant McQueen violated his substantive and procedural due process rights pursuant to § 1983 by failing to provide him with a hearing pursuant to the Law Enforcement Officer Bill of Rights ("LEOBOR"), 11 Del. C. § 9203. (D.I. 24 ¶¶ 41-49).  A property interest is entitled to protection under substantive due process of the United States Constitution, however, only if it is considered a "fundamental" interest.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 235 n.12 (3d Cir. 2006).  The Third Circuit has held that "public employment is not a fundamental right entitled to substantive due process protection."  *Id.* (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142-43 (3d Cir. 2000)).

Martinez does not address the cases cited by Defendants, and instead argues that "it is undisputed that he was subject to a collective bargaining agreement, as such had reasonable basis to presume that his employment would continue."  (D.I. 90 at 10) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)). Plaintiff then simply states that "the Court should view Mr. Martinez's expectation of employment as similar to the continued expectation of employment discussed in Roth."  *Id.*  The Court declines to do so.  First, Plaintiff has offered no explanation or analysis of how the decision in *Roth* applies to a collective bargaining agreement or what portions of the collective bargaining agreement purportedly apply.[18]  Moreover, in *Roth*, the Supreme Court held that an untenured professor did not have a fundamental property interest in continued employment.  The Supreme Court made clear that to have "a property interest, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral

---

[18]    Defendants included the collective bargaining agreement in their Appendix (*see* D.I. 84 at DSPA-252-282), but Plaintiff does not refer to the exhibit in his opposition.

expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Here, there is no evidence that Plaintiff had a legitimate claim of entitlement to his job.

As to procedural due process, a plaintiff must have taken advantage of the processes that are available to him or her before asserting a claim. *See DeNinno v. Municipality of Penn Hills*, 269 F. App'x 153, 157 (3d Cir. 2008) ("[I]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what they want."); *see also Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("A state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."). Here, Martinez had several avenues to pursue his claims, but chose not to do so.

In the February 25, 2015 termination letter, McQueen advised Martinez that he could schedule a meeting with McQueen or his designee to discuss the termination by notifying the Director of Human Resources in writing within five calendar days. (D.I. 84 at DSPA-174). Martinez did not do so. In addition, Martinez was a member of the DSTA, which had entered into collective bargaining agreement with DSP. (*Id.* at DSPA-252; *see also id.* at DSPA-351-352). The collective bargaining agreement had a grievance procedure that Martinez could have exercised through his union. (*Id.* at DSPA-257). Martinez did not do so.

Plaintiff asserts that he was denied an Internal Affairs hearing under LEOBOR, 11 Del. C. § 9203, which states:

> If a law-enforcement officer is: (1) suspended for any reason, or (2) charged with conduct alleged to violate the rules or regulations or general orders of the agency that employs the officer, or (3) charged with a breach of discipline of any kind, which charge could lead to any form of disciplinary action (other than a reprimand) which may become part of the officer's permanent personnel record, then that officer shall be entitled to a hearing which shall be conducted in accordance with this chapter unless a contractual disciplinary grievance procedure executed by and between the agency and the bargaining unit of that officer is in effect, in which case

the terms of that disciplinary grievance procedure shall take precedence and govern the conduct of the hearing.

Martinez's attorney, Liguori, originally "request[ed] an Internal Affairs hearing and procedures afforded pursuant to LEOBOR." (D.I. 84 at DSPA-168). He agreed, however, to waive the hearing pending the outcome of the criminal case (*id.* at DSPA-347, 354-355), and the again to waive the hearing pending the outcome of the DELJIS hearing (*id.* at DSPA-354-56). Within days of the DELJIS hearing, McQueen terminated Martinez due to his loss of his DELJIS access. There is no further discussion of a hearing in the record, and an IA hearing pursuant to LEOBOR did not occur. Assuming that a violation of LEOBOR did occur, however, Plaintiff has not cited to any authority to suggest that a violation of LEOBOR, a state statute, generates a constitutional due process claim – particularly in light of the procedural avenues available.

Even if the Court were to find a procedural due process violation occurred, however, McQueen is entitled to qualified immunity. In the Third Circuit, qualified immunity is "broad in scope and protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (internal citations omitted). A defendant is entitled to qualified immunity "if reasonable officers could have believed their conduct was lawful 'in light of clearly established law and the information the searching officers possessed.'" *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Plaintiff argues that qualified immunity should not apply because "LEOBOR is a well-known Delaware statute that plainly requires certain enhanced procedural due process for officers" and McQueen "chose to terminate Mr. Martinez without a hearing." (D.I. 90 at 13). The only evidence before the Court, however, is that McQueen believed he was administering an "administrative separation" based on failure to meet the requirements of the job, rather than a disciplinary separation. (D.I. 95, Ex. A at 6-8). Despite Plaintiff's assertions about LEOBOR, there is no evidence that McQueen was aware of any

policies or controlling case law that required a trooper to receive an internal affairs hearing when the officer was discharged due to a basic failure to meet all job requirements. The Court finds that McQueen is entitled to qualified immunity for any violations of due process and will thus grant summary judgment in favor of Defendant McQueen.

IV.     **CONCLUSION**

For the reasons stated, Defendants motion for summary judgment is granted. An appropriate order will follow.